[No. A132778. First Dist., Div. Five. Dec. 31, 2012.]

JOE REQUA et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1120(a) and 8.1105(c)(6), this opinion is
certified for publication with the exception of parts V., VI., and VII.

COUNSEL

Stember Feinstein Doyle Payne & Kravec, John Stember, William T. Payne; Sinclair Law Office, Andrew Thomas Sinclair; Carter Carter Fries & Grunschlag and Dov M. Grunschlag for Plaintiffs and Appellants.

Charles F. Robinson, Allison M. Woodall; Hanson Bridgett, Joseph M. Quinn, Dorothy S. Liu and Sarah D. Mott for Defendant and Respondent.

## OPINION

**JONES, P. J.**—Appellants Joe Requa, Wendell G. Moen, Jay Davis, and Donna Ventura (hereafter collectively Retirees) all spent decades working at

the Lawrence Livermore National Laboratory (Livermore). During their employment there, Livermore was operated by the University of California (the University or UC), a state agency governed by The Regents of the University of California (the Regents). After retiring from Livermore, Retirees all received University-sponsored group health insurance benefits.

In 2007, management and operation of Livermore was transferred from the University to a private consortium. On January 1, 2008, Retirees' University-sponsored group health insurance was terminated, and the consortium assumed responsibility for providing Retirees' health insurance benefits.

Retirees later brought an action for mandamus against the Regents, claiming that the elimination of their University-sponsored group health insurance benefits constituted an unconstitutional impairment of either an express or implied contract the Regents had formed with Retirees. Their petition also claimed the doctrines of promissory and equitable estoppel prohibited the termination of their University-sponsored group health insurance benefits. They further sought a declaratory judgment. After the Regents successfully demurred to Retirees' original petition, they filed an amended pleading. The Regents again filed a demurrer, which the trial court sustained without leave to amend.

Retirees appeal from the resulting judgment. They contend their amended petition adequately pleaded causes of action for impairment of express and implied contract, as well as causes of action for promissory estoppel, equitable estoppel, and declaratory relief. We agree with Retirees with respect to all but their claim for impairment of express contract. We conclude their other claims should not have been resolved on demurrer. Accordingly, we affirm the judgment in part and reverse it in part.

FACTUAL AND PROCEDURAL BACKGROUND

"In ruling on the demurrer, the trial court had to accept as true all material facts properly pleaded in [Retirees'] petition, disregarding only conclusions of law and allegations contrary to judicially noticed facts." (*Burt v. County of Orange* (2004) 120 Cal.App.4th 273, 277 [15 Cal.Rptr.3d 373].) On appeal, we must do the same, and we therefore set out below the material allegations of the Retirees' first amended petition for writ of mandate. (*Id.* at pp. 277, 279.)

Livermore opened in 1952 as a branch of the University of California Radiation Laboratory. From 1952 until 2007, the University operated Livermore under a contract with the United States Department of Energy (DOE) or predecessor agencies of the federal government.

Retirees are all former employees of the University. All of them spent decades working at Livermore.[1] During that time, Retirees were regular employees of the University, and while the Regents managed Livermore, they treated University employees who worked there in the same manner as other University employees. Livermore employees were entitled to the same benefits and were subject to the same terms and conditions of work and personnel policies as other University employees. By virtue of their employment at Livermore, Retirees became members of the University of California Retirement System (UCRS), which later became known as the University of California Retirement Plan (UCRP).

In 1961, the Regents adopted a resolution authorizing medical benefits for University employees and retirees. At the time the Regents first authorized retiree medical benefits, there was no policy or provision of state law, nor any provision of the Regents' own policies, that prohibited or limited the Regents' authority to offer such benefits. The Regents' authorization did not include any provision permitting the Regents to terminate or eliminate these benefits, and the Regents did not reserve the authority to modify vested retirement benefits in a manner that was inconsistent with California law or to transfer the responsibility for providing a vested benefit to another entity.

After authorizing medical benefits, the University began telling employees they would receive health coverage while working and during retirement so long as they met eligibility requirements. For example, in 1979, the Regents published a booklet concerning UCRS. Under the heading "Health Insurance During Retirement," the booklet stated, "You may continue your University-sponsored group health plan coverage for you and your family after you retire. In most cases the premiums will be the same as when you were employed, and you will continue to receive The Regents' health plan contribution. The balance of the premium will be deducted from your monthly Retirement Income." The following year, Livermore published a "Benefits Information Packet" summarizing its health insurance benefits. With regard to health insurance benefits during retirement, the document stated, "Coverage can be continued as long as monthly income received from retirement system is large enough to cover employee contribution. Employer contribution continues during retirement."

A 1984 UCRS booklet entitled "Your retirement plan coordinated with Social Security" explained that "[i]f the conditions shown in the box are met,

---

[1] Requa was first hired by the University in 1961, but left in 1963 to continue his education. He returned and began working at Livermore in 1965, where he worked continuously until his retirement in 1999. Moen began working at Livermore in 1963 and retired in 2000. Davis began working at Livermore in 1971 and retired in 2002. Ventura began working at Livermore in 1974 and retired in 2006. During their employment at Livermore, Moen, Davis, and Ventura had no breaks in University service.

UC-sponsored health and dental plan coverage can be continued for yourself and enrolled family members when UCRS monthly benefits are paid. The University's monthly contribution for your plan premiums also continues, in the same amount as for active employees, if the conditions are met." The only "condition[] in the box" for receiving continued health and dental coverage during retirement was that "UCRS benefits must start *within four months after your employment ends.*"

Livermore issued a publication entitled "Benefits" in 1988,[2] in which it said, "[B]enefit plans make up a large part of your compensation" and "are like your other paycheck." The publication also stated, "When you retire you can keep your health, dental and legal plan coverages; [Livermore's] contributions to the health and dental plans continue, provided you retire within four months of separating from [Livermore]." "Benefits" told employees the publication was a "general overview of your personal and family benefit plans. You shouldn't consider it a promise or guarantee of plan coverage or benefits. You have to meet eligibility rules for coverage and qualification rules to receive benefits."

In 1990, Livermore's benefits office distributed a document entitled "The Retiree Handbook." On a page headed "Insurance" appeared the question, "How does retirement affect my insurance plans?" The response stated, "Whether a member of [the Public Employee Retirement System] or UCRP, your University group medical and dental plans may be continued when you retire, *provided that you are enrolled at the time of retirement.*"

In the late 1990s, the Regents began inserting language into benefits books and publications stating that retiree medical benefits were not vested and could be modified or eliminated at any time. The Regents distributed the University of California Retirement Handbook (Retirement Handbook) in 1998. That handbook explained that retiring employees electing "UCRP monthly retirement income . . . may be eligible to continue . . . UC medical and/or dental coverage if" they met certain eligibility criteria. It also stated, "Health and welfare benefits are not accrued or vested benefit entitlements. UC's contribution toward the monthly cost of the coverage is determined by UC and may change or stop altogether, subject to the state of California's annual budget appropriation." In small print on the inside back cover of the 1998 handbook, the following language appeared: "What is written here does not constitute a guarantee of plan coverage or benefits—particular rules and eligibility requirements must be met before benefits can be received. The

---

[2] Although this publication was issued by Livermore, it explained that the benefits outlined in it were "governed entirely by the terms of retirement plan provisions, University of California Group Insurance Regulations and group health/insurance plan contracts, and applicable state and federal laws."

University of California intends to continue the benefits described here indefinitely; however, the benefits of all employees, annuitants, and plan beneficiaries are subject to change or termination at the time of contract renewal or at any other time by the University or other governing authorities. The University also reserves the right to determine new premiums and employer contributions at any time. Health and welfare benefits are subject to legislative appropriation and are not accrued or vested benefit entitlements."

In approximately December 2000, the Regents published a University of California Retirement Plan Election Handbook. Regarding "UC-Sponsored Health and Welfare Coverage," this handbook stated, "Generally, if you are eligible to continue coverage and you elect monthly retirement income, you may continue the same coverage." It also explained that retirees can change their medical and/or dental plans after they retire "during Open Enrollment, which is usually held each November." The handbook also included the following language: "UC reserves the right to determine new premiums and employer contributions at any time. Health and welfare benefits are subject to legislative appropriation and are not accrued or vested benefit entitlements."

At all relevant times, Retirees met the eligibility requirements for University-sponsored group health plan coverage. They retired between 1996 and 2006 (see fn. 1, *ante*) after decades of service to Livermore, where they had remained in significant part because they would receive University-sponsored group health plan coverage when they retired.

Between the 1960s and 2007, the Regents provided the same medical benefits to active and retired employees who had worked at Livermore as they provided to other active and retired University employees. Until late 2007 or early 2008, the Regents treated Livermore retirees in the same manner as other University retirees. The Regents provided Retirees with the promised medical benefits from their retirement until 2008.

In 2007, the DOE did not renew its contract with the Regents to manage Livermore, contracting instead with a newly created private consortium known as Lawrence Livermore National Security (LLNS).[3] On or about January 1, 2008, the Regents terminated Retirees' health coverage under the University plan and shifted responsibility for providing retiree medical benefits for Livermore retirees to LLNS. At that time, the University assured Livermore retirees that they would continue to receive substantially equivalent medical benefits from LLNS.

---

[3] The consortium was formed by the University, Bechtel National, Babcock and Wilcox, and other entities.

In August 2008, Requa advised the University's acting general counsel that he believed the Regents had acted unlawfully by terminating University-provided medical benefits and shifting that responsibility to LLNS. While the University did not respond directly to Requa's concerns, counsel for LLNS responded by e-mail on September 16, 2008, stating that "medical costs for [Livermore] retirees have always been paid for by [the] operating costs of [Livermore]" and that "coverage could change or be terminated at any time." Counsel for LLNS also said DOE had determined "that [Livermore] employees who retired from UC would no longer be included in the UC retiree pool for coverage purposes" and that in the future, benefits "may not be equivalent to those offered by the University."

LLNS has provided coverage that is more expensive than, and inferior to, the health benefits formerly provided by UCRP. In addition, Retirees have been removed from the University-wide risk pool comprised of both active and retired employees and are segregated into a smaller, older, and more infirm group, which will cause the cost of their coverage to increase more rapidly compared to other University retirees.

On August 11, 2010, Retirees filed their original petition for writ of mandate against the Regents in Alameda County Superior Court. The petition alleged causes of action for impairment of contract, promissory estoppel, and declaratory relief. The Regents filed a demurrer, which the trial court sustained with leave to amend.

On January 24, 2011, Retirees filed a first amended petition for writ of mandate (FAP). It alleged causes of action for impairment of implied contract, impairment of express contract, promissory estoppel, equitable estoppel, and declaratory relief. The contract counts alleged that the Regents' termination of Retirees' vested rights to University-sponsored group health insurance coverage violated the contract clause of the California Constitution. (Cal. Const., art. I, § 9.) Attached to the FAP were excerpts from benefit handbooks the University had distributed to employees between 1979 and 2000. The Regents again responded by demurrer, and on May 26, 2011, the trial court sustained the Regents' demurrer without leave to amend.

The trial court cited three reasons for dismissing Retirees' contract counts. First, it found that none of the language in the benefit handbooks cited by Retirees was "sufficient to create either an express or implied contract upon which to base a cause of action for impairment of contract." Instead, it found that "the statements are replete with conditional language." The trial court also noted that "as early as 1990, some 20 years before the Petition was filed," the Regents had included language in the benefits booklets and handouts "clearly stating that retiree medical benefits were not vested and

could be modified or eliminated at any time." Furthermore, the Regents had inserted "reservation of rights language" in the retirement information materials distributed after 1990, and the trial court found that statements made after 1990 "are indisputably not express contractual promises."

Second, the trial court also ruled that Retirees had failed "to provide any statutory or legislative authorization which would allow such a promise to be binding" on the Regents. Absent such statutory or legislative authority, even if a promise had been made to Retirees, "such a promise would not constitute [a] binding contract against [the Regents], a public entity." The court found that Retirees had "identified no minutes, formal resolution or standing order issued by [the Regents] conferring on [Retirees] retirement medical benefits of a certain type in perpetuity."

Third, the trial court held that Retirees' allegations that retiree medical benefits are vested rights created via implied contract were unsupported by case law. It concluded that "California courts have been clear in holding that absent clear intent on the part of the public entity, a long-term financial commitment for retiree medical benefits cannot·be implied."[4]

The lower court sustained the demurrer to the promissory estoppel cause of action because it found Retirees had alleged no clear and unambiguous promise to lifetime retiree medical benefits. As to equitable estoppel, the court found that the Retirees could not allege the Regents "knew that retirement medical benefits were not vested rights and were subject to modification and elimination, yet never communicated such information to [Retirees]." Finally, because the cause of action for declaratory relief was derivative of the other four causes of action, the trial court sustained the demurrer to that cause of action as well.

Judgment was entered on June 8, 2011, and Retirees filed a notice of appeal on July 29, 2011.

### DISCUSSION

Retirees claim the superior court improperly sustained the Regents' demurrer to the FAP. They argue they have adequately pleaded claims for breach of either an express or implied contract. For that argument, Retirees rely heavily on our state Supreme Court's recent decision in *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171 [134

---

[4] The court did note that the question of whether an implied contract can be formed to confer vested rights to medical benefits for retirees had been certified for review by this state's Supreme Court. (See *Retired Employees, Orange County v. County of Orange* (9th Cir. 2010) 610 F.3d 1099, 1101 [certifying question to Supreme Court of Cal.].)

Cal.Rptr.3d 779, 266 P.3d 287] (*Retired Employees*), a decision we will discuss in some detail below. Retirees also claim the FAP is sufficient to plead claims for promissory and equitable estoppel.

The Regents defend the superior court's decision on a number of grounds, arguing principally that Retirees have not overcome the general presumption that a public employer's statutory scheme is not intended to create private contractual rights. According to the Regents, courts may impose implied contractual obligations on a public employer only where the relevant legislative body clearly evinces an intent to create an implied contract. Here, the Regents contend, Retirees have identified no documents that clearly evince such an intent.[5] They further argue Retirees have not overcome the presumption against the formation of a vested right to health insurance benefits. The Regents also assert that Retirees have failed to allege facts sufficient to make out their claims for promissory and equitable estoppel. Finally, the Regents argue we should affirm the judgment on the alternative ground that Retirees' claims are barred by the statute of limitations and the doctrine of laches.

We will first discuss our standard of review, an issue about which the parties initially disagreed in their briefs. We will then turn to an examination of the *Retired Employees* decision before addressing the merits of the parties' arguments.

## I. *Standard of Review*

"Just as the trial court, an appellate court reviewing a judgment entered after a demurrer has been sustained without leave to amend assumes the truth of all properly pleaded material facts unless contradicted by judicially noticed matters. [Citation.] The appellate court determines whether, reading the petition as a whole and giving it a reasonable interpretation, the pleading states facts sufficient to state a cause of action or a reasonable possibility exists that any defects can be cured by amendment. [Citations.] If the answer to either question is yes, then the trial court erred in making its ruling. [Citation.]" (*Burt v. County of Orange, supra*, 120 Cal.App.4th at p. 279.)

 In performing our review, we are mindful that "[i]t is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213 [197

---

[5] The Regents argue only that Retirees' allegations do not satisfy the threshold requirement of pleading the existence of an express or implied contract. They do not separately contend that if we find such a contract has been pleaded, their actions nevertheless do not constitute an unconstitutional impairment of the contract. (See Cal. Const., art. I, § 9.)

Cal.Rptr. 783, 673 P.2d 660].) In considering the merits of a demurrer, "the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.]" (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [176 Cal.Rptr. 824].) Thus, when reviewing the propriety of a judgment sustaining a demurrer, the question of the plaintiffs' or petitioners' "ability to prove . . . allegations, or the possible difficulty in making such proof does not concern the reviewing court." (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

In reviewing the superior court's order sustaining the demurrer, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory . . . ."[6] (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) While our focus is on the pleadings, "[r]elevant matters that are properly the subject of judicial notice may be treated as having been pled." (*Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 742 [122 Cal.Rptr.2d 787].) Even if the trial court has not ruled on a party's request for judicial notice, we may ourselves take judicial notice of appropriate matters.[7] (*SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 82–83, fn. 8 [76 Cal.Rptr.3d 73].) If the allegations of the complaint or petition conflict

---

[6] At oral argument, the Regents' counsel conceded that the trial court's ruling on the demurrer is subject to our independent review. Although the Regents' opening brief had contended we should review the order sustaining the demurrer only for substantial evidence, counsel acknowledged that this contention was erroneous. Counsel further conceded that the statement in the Regents' opening brief that the trial court had made factual findings was likewise incorrect. Indeed, if this statement were true, that itself would be grounds for reversing the ruling in favor of the Regents. (See *Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408, 416, 422 [231 Cal.Rptr. 113] [trial court errs if it resolves issues of fact in ruling on demurrer], disapproved on another point in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365].)

[7] Both Retirees and the Regents requested judicial notice of certain documents in the court below. For reasons not apparent from the record, the trial court did not rule on these requests. Retirees sought judicial notice of resolutions and minutes of the Regents dating from 1958 to 1961 and dealing with group life and health insurance and welfare benefits, as well as historical versions of University benefits booklets. These materials were proper subjects of judicial notice, and we may consider them on appeal. (See *California State Employees' Assn. v. Flournoy* (1973) 32 Cal.App.3d 219, 233, fn. 10 [108 Cal.Rptr. 251] (*Flournoy*) [taking judicial notice of certain of the Regents' standing orders, sections of a University administrative manual, and a University personnel rule].)

In this court, the Regents also seek judicial notice of historical versions of benefits booklets. These may be judicially noticed, and we therefore grant the request with respect to exhibits G through M, attached to the Regents' May 29, 2012 request for judicial notice. (*Flournoy, supra,* 32 Cal.App.3d at p. 233, fn. 10.) We also grant their request with respect to exhibit A, which contains DOE's request for proposals for the contract to manage and operate Livermore. (Evid. Code, § 452, subd. (c); *E. H. Morrill Co. v. State of California* (1967) 65 Cal.2d 787, 794–795 [56 Cal.Rptr. 479, 423 P.2d 551].)

We deny the Regents' request for judicial notice with respect to exhibits B through F, which are copies of bylaws, minutes, and standing orders of the Regents. While such materials may

with attached exhibits, we give preference to the exhibits. (See *id.* at p. 83.) If the exhibits are ambiguous but can be construed as the plaintiffs or petitioners suggest, then we must accept their construction. (*Ibid.*) Similarly, we must accept the plaintiffs' or petitioners' allegations regarding the construction of an ambiguous contract, "[s]o long as the pleading does not place a clearly erroneous construction upon the provisions of the contract." (*Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 128 [226 Cal.Rptr. 321].)

II. *The Supreme Court's Decision in* Retired Employees

■ One of the reasons the trial court gave for sustaining the Regents' demurrer was that there could be no implied contract for retiree medical benefits. Since judgment was entered in this case, however, the California Supreme Court has disagreed. In *Retired Employees, supra,* 52 Cal.4th 1171, the court held that "under California law, a vested right to health benefits for retired county employees can be implied under certain circumstances from a county ordinance or resolution." (*Id.* at p. 1194.)

The holding in *Retired Employees* came in response to a certified question from the United States Court of Appeals for the Ninth Circuit. (*Retired Employees, supra,* 52 Cal.4th at pp. 1176, 1178, 1194.) The underlying federal litigation arose out of a suit brought by REAOC (the Retired Employees Association of Orange County, Inc.), an organization of retired Orange County employees, against Orange County (County). (*Id.* at p. 1177.) In 1966, County had begun to offer group medical insurance to its retired employees. It initially calculated the premiums for active and retired employees separately, but in 1985, County began to combine active and retired employees into a single unified pool for purposes of calculating health insurance premiums. (*Ibid.*) "The single unified pool . . . had the effect of subsidizing health insurance for retirees, in that it lowered retiree premiums below their actual costs, while raising active employee premiums above their actual costs." For budgetary reasons, in 2007, County passed a resolution splitting the pool of active and retired employees. (*Ibid.*)

REAOC sued County, seeking an injunction prohibiting the county from splitting the pool of active and retired employees. (*Retired Employees, supra,* 52 Cal.4th at p. 1177.) "REAOC conceded that the *express* provisions of the various memoranda of understanding . . . and the Orange County Board of Supervisors (Board) resolutions were silent as to the duration of the unified pool. But REAOC nonetheless alleged that County's action constituted an

---

generally be subject to judicial notice, the versions offered are all dated 2011, and the Regents have made no showing that these were the bylaws or standing orders that were in effect at the times relevant to this suit.

impairment of contract in violation of the federal and state Constitutions, in that County's long-standing and consistent practice of pooling active and retired employees, along with County's representations to employees regarding a unified pool, created an *implied* contractual right to a continuation of the single unified pool for employees who retired before January 1, 2008." (*Id.* at pp. 1177–1178.) Among other things, REAOC relied on representations contained in booklets County distributed to active employees describing health benefits available in retirement. (*Id.* at p. 1178.) After the federal district court granted summary judgment to County, REAOC appealed to the Ninth Circuit, which then asked the California Supreme Court to decide whether an implied contract to which a county is a party could confer vested rights to health benefits. (*Ibid.*)

In the California Supreme Court, County argued "(1) that a county government and its employees cannot form an implied contract; (2) that even if implied contracts are cognizable in the public employment context, such contracts cannot create vested rights; and (3) that even if vested contractual rights for county employees may be implied, such rights cannot include health benefits." (*Retired Employees, supra,* 52 Cal.4th at p. 1179.) Our Supreme Court rejected each of these arguments. (*Id.* at pp. 1179–1193.) Most significant for our purposes is the court's discussion of the first issue—how implied contracts may be formed in public employment.

*Retired Employees* held that a county may be bound by the terms of an implied contract so long as there is no legislative prohibition against such arrangements, such as a statute or ordinance.[8] (*Retired Employees, supra,* 52 Cal.4th at p. 1176, citing *Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 246 [74 Cal.Rptr. 398, 449 P.2d 462] (*Youngman*).) The court cautioned that courts must be sensitive to the fact that the principal function of governmental bodies is to make laws that establish policy, not to make contracts. (*Retired Employees, supra,* 52 Cal.4th at p. 1185.) " 'Thus, it is presumed that a statutory scheme is not intended to create private contractual or vested rights and a person who asserts the creation of a contract with the state has the burden of overcoming that presumption.' [Citation.]" (*Id.* at p. 1186.) After reviewing California case law on the issue, the court concluded generally "that legislation in California may be said to create contractual rights when the statutory language or circumstances accompanying its passage 'clearly ". . . evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' [Citation.] Although the intent to make a contract must be clear, our case law

---

[8] The Regents cite no statute or other legislative enactment that would prohibit them from being bound by the terms of an implied contract, and they do not argue that they may not be so bound.

does not inexorably require that the intent be express. [Citation.] A contractual right can be implied from legislation in appropriate circumstances. [Citation.]" (*Id.* at p. 1187.) Thus, while we must " 'proceed cautiously both in identifying a contract within the language of a . . . statute and in defining the contours of any contractual obligation[,]' . . . [t]he requirement of a 'clear showing' that legislation was intended to create the asserted contractual obligation [citation] should ensure that neither the governing body nor the public will be blindsided by unexpected obligations." (*Id.* at pp. 1188–1189, citation omitted.)

■ The court in *Retired Employees* also held that vested contractual rights may be implied from legislation in certain circumstances; vesting is simply a matter of the parties' intent. (*Retired Employees, supra,* 52 Cal.4th at p. 1189.) Thus, public employee benefits may become vested by implication in appropriate circumstances. (*Id.* at p. 1190.) "However, as with any contractual obligation that would bind one party for a period extending far beyond the term of the contract of employment, implied rights to vested benefits should not be inferred without a clear basis in the contract or convincing extrinsic evidence." (*Id.* at p. 1191.)

Having summarized the holdings in *Retired Employees,* we now apply its analysis to the case before us.

III. *Retirees Have Adequately Pleaded a Cause of Action for Breach of an Implied Contract.*

■ Retirees contend that under *Retired Employees,* the University's obligation to provide lifetime retiree medical benefits to them on the same terms as other University retirees may be implied from the authorization of those benefits in 1961, the uninterrupted provision of those benefits for more than 50 years, and from the University's publications assuring employees they would receive health benefits in retirement so long as they met certain eligibility requirements.[9] They contend the lower court erred in finding Retirees had identified no minutes, formal resolution or standing order from the Regents conferring on Retirees retirement medical benefits in perpetuity.

---

[9] Retirees do not explicitly argue the existence of an express contract. They claim in a footnote that "the Regents' authorization, together with repeated written assurances made over many decades, *could form* the basis of an *express* contract." (First italics added.) Claiming these facts *could* form the basis of an express contract is not the same as claiming that they do. Moreover, we may decline to consider arguments raised only in footnotes. (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 [107 Cal.Rptr.3d 805] ["Footnotes are not the appropriate vehicle for stating contentions on appeal."].) At oral argument, the Regents' counsel contended Retirees' claims were based entirely on an implied contract, and Retirees' counsel did not disagree. We therefore conclude Retirees have abandoned their claim of impairment of an express contract.

Having reviewed the allegations of the FAP and the matters properly subject to judicial notice, we conclude Retirees are correct.

Retirees alleged that the Regents first authorized medical benefits for Livermore retirees in the 1960s. This authorization was alleged to have been given "in accordance with policies and procedures used by the Regents in the ordinary course of their business and in the proper exercise of their powers." Retirees also alleged that the Regents did not reserve any right to terminate, eliminate, or modify these benefits in a manner that was not consistent with the legal authority of California public agencies to modify vested retirement benefits, nor did the Regents reserve the right to transfer the responsibility for providing this benefit to another entity. According to the FAP, the Regents also did not reserve any right to exclude Livermore retirees from coverage under University-sponsored group health coverage or to treat those retirees differently from other University employees and retirees. Retirees claimed that from the 1960s until 2007, the Regents have provided retiree medical benefits without interruption.[10]

In addition to the allegations of the FAP, Retirees properly sought judicial notice of an October 23, 1961 resolution by the Regents. (See *Flournoy, supra*, 32 Cal.App.3d at p. 233, fn. 10.) In that resolution, the Regents authorized the president of the University, in connection with the University's "Employee Health and Life Insurance Program," "to approve for continued payroll deductions and health insurance subsidy those existing plans which are willing to amend their benefits *to provide equal benefits to retired employees*." (Italics added.) Retirees allege that for more than 50 years after issuing this resolution, the Regents provided University retirees the same medical benefits they provided to University employees.

Thus, the essential allegations of Retirees' claim of implied contract were that the Regents authorized University-sponsored group health insurance coverage for retirees, and then during Retirees' employment at Livermore, the Regents—through various benefit booklets and handbooks published by their authorized representatives—offered to provide Retirees with University-sponsored group health plan coverage when they retired. (See *Hunter v. Sparling* (1948) 87 Cal.App.2d 711, 721–722 [197 P.2d 807] [enforceable promise to pay pension benefits inferred from personnel policies]; *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 828–833 [67

---

[10] In the court below, the Regents agreed "[t]here is no dispute that The Regents authorized, and the University sponsored, medical insurance coverage for [Livermore] retirees until 2007." Thus, to the extent the Regents claim the FAP fails sufficiently to allege that they authorized or sponsored the claimed retiree medical benefits from the time of authorization until 2007, their admission has cured any deficiency in Retirees' pleading. (See *Mohlmann v. City of Burbank* (1986) 179 Cal.App.3d 1037, 1041, fn. 2 [225 Cal.Rptr. 109].)

Cal.Rptr.3d 635] [University's promise on its Web site and in catalogues not to raise certain fees held to be an implied contract].) Retirees allegedly accepted this offer through working at Livermore and continuing to provide services over time, and they claim they remained there because of the promise they would have University-sponsored group health plan coverage in retirement. (See *Hannon Engineering, Inc. v. Reim* (1981) 126 Cal.App.3d 415, 425 [179 Cal.Rptr. 78] [pension plan offered by employer and impliedly accepted by employee by remaining in employment constitutes a contract, whether plan is public or private; continued employment is consideration for promise to pay pension].) The booklets and handbooks informed University employees that they could continue their University-sponsored group health insurance coverage after they retired, provided they met certain eligibility criteria. Retirees alleged that they met these criteria at all relevant times.

■ "In pleading a cause of action on an agreement implied from conduct, only the facts from which the promise is implied must be alleged." (*Youngman, supra,* 70 Cal.2d at pp. 246–247.) The foregoing allegations suffice to plead a cause of action based on an implied contract. (See *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 504–505 [202 Cal.Rptr. 611].)

IV. *The Regents' Arguments in Support of the Trial Court's Order Are Unpersuasive.*

The Regents offer a number of arguments in support of the trial court's ruling. For the most part, these arguments are not directed to the sufficiency of the allegations of the FAP, but rather are based almost entirely on matters outside of the operative pleading. As such, they have limited force given the procedural posture of this case, which requires us to accept the truth of Retirees' allegations and restricts our review to those allegations and matters that are properly subject to judicial notice.

A. *Retirees Are Not Required to Prove Their Case to Overcome a Demurrer.*

The Regents first argue Retirees have "provided no documents that clearly evince" an intent on the Regents' part to provide lifetime retiree health benefits.[11] We are somewhat puzzled by this argument, because we are

---

[11] The trial court appears to have agreed with this argument, finding that Retirees "concede in Paragraph 65 [of the FAP] . . . that despite searching, they have no resolutions issued by [the Regents] authorizing retiree medical benefits." In fact, however, the cited paragraph says only that Retirees have sought such resolutions from the Regents but the Regents had not yet provided them. The trial court also did not mention that Retirees had located the 1961 resolution authorizing retiree health benefits.

reviewing the trial court's ruling on a demurrer, and we must therefore assume the truth of all of the allegations of the FAP. (*Burt v. County of Orange, supra,* 120 Cal.App.4th at p. 279.) To prevail on appeal, Retirees are not required to show they already possess the evidence that will prove their case. The only question before us is whether the *allegations of the FAP* are sufficient to state a cause of action under any legal theory. (*McCall v. PacifiCare of Cal., Inc., supra,* 25 Cal.4th at p. 415.)

B. *The FAP Sufficiently Alleges the Regents Have Authorized Retiree Health Benefits.*

The Regents next claim they have not delegated their authority to contract with employees for lifetime retiree health benefits, nor have they passed legislation granting such benefits.[12] They note, correctly, that matters of employee compensation and benefits fall within their constitutional grant of authority. (*In re Work Uniform Cases* (2005) 133 Cal.App.4th 328, 344 [34 Cal.Rptr.3d 635].) But they misread the FAP when they contend it alleges that the contract was created only by statements made by the Regents and their authorized representatives. The FAP alleges the retiree health benefits were properly authorized by the Regents themselves. As we read the pleading, Retirees allege that this express authorization, the later statements of the Regents and their authorized representatives, and the uninterrupted provision of University-sponsored group health benefits from Retirees' retirement dates through 2007, create an implied contract to provide Retirees with University-sponsored group health benefits throughout the period of their retirement. In *Retired Employees,* the California Supreme Court held that very similar allegations were sufficient to state a claim for breach of implied contract. (*Retired Employees, supra,* 52 Cal.4th at pp. 1177–1178, 1183, 1187 [County's removal of retired employees from unified medical insurance pool alleged to have impaired contract because of County's long-standing practice of pooling active and retired employees and County's representations to employees regarding unified pool].)

---

[12] The Regents assert that their standing orders do not grant the president of the University authority over the operation or administration of "[a]greements for the provision of employee group insurance benefits." In support of this argument, they requested judicial notice of Regents Standing Order 100.4(dd) (Feb. 18, 2011), a request we have denied. We note nevertheless that whatever this 2011 standing order may mean, it would tell us only what the *current* authority of the president of the University is. It says nothing about what the president's authority may have been at the times relevant to Retirees' action. The president's authority may or may not have been so limited under earlier versions of the standing orders.

In response to appellant Requa's public records act request, the Regents' managing counsel wrote that the University "does not maintain historical versions of the Standing Orders." But the fact that the Regents do not keep copies of these standing orders does not mean no copies exist. Nor does it mean that the content of such orders could not be shown using other methods of proof.

### C. The Extent and Limits of the Regents' Authority Can Only Be Determined After Discovery.

The Regents contend there is no document or "regental action" limiting their ability to provide different benefits to Livermore retirees than to other University retirees. In the court below, however, Retirees offered a 1971 benefits booklet stating, "The complete provisions of the UCRS are set forth in the Standing Order of The Regents relating to the University of California Retirement System. All informational booklets are subject in every respect to the Standing Order, and where any differences may occur, the Standing Order shall govern." If it can be located, the terms of the standing order to which this booklet refers might define the Regents' authority with respect to retiree health benefits. Obviously, this is a matter that must await further factual development, but it demonstrates this issue cannot properly be resolved on demurrer. Moreover, the Regents' argument seems to contradict the FAP, which alleges that after authorizing the benefits at issue, the Regents reserved no right to modify or eliminate them or to treat Livermore retirees differently from other University retirees.

### D. Retirees' Interpretation of the Benefits Booklets Is Not Clearly Erroneous.

The Regents next contend that the benefits booklets and handbooks attached to the FAP contain no promise of lifetime retiree health benefits. In fact, the Regents read the language of these materials as showing an intent not to create vested rights. Like the trial court, they rely on language in the booklets stating that employees' health benefits "may continue" or "can be continued" in retirement. The Regents and the trial court view this as conditional language that cannot create a vested right to University-sponsored health benefits in retirement.

But as Retirees point out, these booklets contain language that could be read as implying a commitment to provide these benefits *throughout* retirement, rather than for an unspecified shorter period *during* retirement. For example, a 1980 benefit publication states that during retirement, health insurance "[c]overage can be continued *as long as monthly income received from retirement system is large enough to cover employee contribution.*" (Italics added.) A 1990 publication informed Livermore employees that "your University group medical and dental plans may be continued when you retire, *provided that you are enrolled at the time of retirement.*" It also contemplated that retirees would be able to participate in the annual open enrollment period, which suggests that the provision of retiree group health insurance benefits would be ongoing. With regard to open enrollment, the University's 1998 *Retirement Handbook* states, "UC will send you information *each year*

explaining your options." (Italics added.) These publications might reasonably be construed as promising Retirees continuing University-sponsored group health insurance so long as they met the stated eligibility criteria and that such coverage would continue throughout the entire period of their retirement. Since it appears the FAP "does not place a clearly erroneous construction upon the provisions of the [alleged] contract, in passing upon the sufficiency of the [petition], we must accept as correct [Retirees'] allegations as to the meaning of the agreement." (*Marina Tenants Assn. v. Deauville Marina Development Co., supra*, 181 Cal.App.3d at p. 128.) Retirees' interpretation may ultimately prove invalid, but it was improper for the trial court to resolve the issue against them based solely on the FAP and the attached materials. (See *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 [282 Cal.Rptr. 233].)

### E. *The Reservation of Rights Language in the Benefits Booklets Is Ambiguous.*

The Regents also rely on reservation of rights language appearing in benefits booklets as demonstrating the University's intent *not* to create vested rights. We do not find this language as unequivocal as the Regents do. The Regents cite a 1988 Livermore publication entitled "Benefits" which states that the publication "gives a general overview of your personal and family benefit plans. You shouldn't consider it a promise or guarantee of plan coverage or benefits." But the very next sentence states, "You have to meet eligibility rules for coverage and qualification rules to receive benefits." Read together, the two statements may simply mean that benefits are contingent upon meeting eligibility requirements, not that the benefits are not vested retirement rights.

Similarly, the 1998 Retirement Handbook says, "Health and welfare benefits are not accrued or vested benefit entitlements." It also goes on to say that "UC's contribution toward the monthly cost of the coverage is determined by UC and may change or stop altogether, subject to the state of California's annual budget appropriation." As Retirees suggest, this language might be read to mean that the University may change or eliminate its contribution toward the cost of coverage, if the state's budget appropriation so required. Indeed, a 2000 UCRP publication explains that "[h]ealth and welfare benefits are subject to legislative appropriation and are not accrued or vested benefit entitlements." The Regents do not claim, however, that Retirees' University-sponsored health insurance coverage was terminated because of the state's budgetary appropriation.

In a related argument, the Regents note that the booklets use the words "lifetime," "for the rest of your life," or "for life" when referring to

retirement income. Since no such language appears in connection with retiree health insurance benefits, the Regents ask us to infer that such benefits are not guaranteed for life. We are unwilling to make such an inference as a matter of law, because other provisions of the booklets upon which the Regents rely are arguably in conflict with this reading. For example, the Regents cite a May 1979 UCRS publication entitled "UCRS and Social Security," which uses the phrase "[l]ifetime retirement income." But under the heading "Vesting," that same publication states, "After you have five years of UCRS service credit, or when you are age 62, you have a non-forfeitable (vested) right to a retirement benefit that is based on both your own *and* Regents' contributions." We asked the parties to address at oral argument what effect, if any, this language might have on Retirees' claims, and they offered differing interpretations. As a court reviewing a demurrer ruling, however, we can express no definitive view as to the meaning of this language. Nevertheless, it provides further support for our conclusion that it cannot be said as a matter of law that Retirees have failed to plead the existence of an implied contract.

F. *The Allegations of the FAP Are Deemed True, Even if Retirees Have Not Yet Discovered "Source Documents."*

The Regents repeat their argument that Retirees have failed to overcome the presumption that legislative acts do not give rise to an implied contract for vested benefits. (See *Retired Employees, supra,* 52 Cal.4th at p. 1186.) They claim that because Retirees have not identified any "source documents that could support their conclusory contentions of an implied contract[,] [t]he allegations . . . are not deemed true on demurrer." In essence, the Regents argue that because Retirees have not produced the evidence that will prove their case, we need not accept the truth of the allegations in the FAP. The cases the Regents cite in support of this rather extraordinary argument do not come close to supporting it.[13]

Moreover, the Regents have conceded they authorized retiree group health insurance benefits. If, as the Regents claim, such benefits can only be authorized by "regental action," then it would seem to follow that a "source document" authorizing those benefits must exist. Retirees have already identified one such source document—the October 23, 1961 resolution. And while it appears the Regents may not keep their own copies of such

---

[13] Although they do not explain the citation, the Regents seem to rely on a statement in *Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792 [223 Cal.Rptr. 206] that enactments which are matters of public record may not be pleaded on information and belief. (*Id.* at p. 802.) Here, however, it appears that one reason Retirees have not yet been able to produce the type of "source documents" the Regents demand is the Regents' own failure to keep copies of their standing orders governing the University's health insurance programs. We see no reason why this alleged failure of proof should support the Regents' challenge by demurrer to the sufficiency of Retirees' pleading.

documents, this does not preclude the possibility that discovery may yield others bearing on the subject matter of this suit.

V.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Disposition

The judgment is affirmed to the extent it dismissed Retirees' claim for impairment of express contract. In all other respects, the judgment is reversed. Retirees shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

Simons, J., and Bruiniers, J., concurred.

---

*See footnote, *ante*, page 213.