Filed 8/1/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| WENDELL MOEN et al.,<br><br>    Plaintiffs and Appellants,<br>v.<br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A153386<br><br>(Alameda County<br>Super. Ct. No. RG10530492) |


Appellants (hereafter, Retirees) are retired employees of the University of California (University) who worked at Lawrence Livermore National Laboratory (Livermore). They claim that during their employment, the University promised to provide them with University-sponsored group health insurance in their retirement, and this promise constitutes an implied contract term that the University subsequently impaired. After initially certifying a class of such retirees, the trial court decertified the class. We agree with Retirees that the trial court's decertification order relied on erroneous legal standards, and we reverse.

BACKGROUND

Livermore is a facility owned by the federal government. From 1952 to 2007, the federal government contracted with the University to manage and operate Livermore, and individuals working at Livermore during this period were University employees. In 1961, the Regents of the University (Regents) authorized the University to provide a group health insurance program for employees and retirees, and Retirees allege the University told employees their health insurance benefits would continue in retirement.

1

Retirees and other Livermore employees who retired before 2007 initially received University-sponsored group health insurance after their retirement. Funding for this insurance was provided by the federal government as part of the University's contract.

In 2007, the federal government transferred the management and operation of Livermore to a private entity, Lawrence Livermore National Security, LLC (LLNS). When LLNS took over operation of Livermore, its contract with the federal government required it to assume responsibility for the health benefits of Livermore retirees. In 2007, these retirees were transferred from University-sponsored group health insurance to LLNS's health plan. The summary plan description for LLNS's retiree health plan states: "LLNS, in its sole discretion, reserves the right to amend or terminate in writing at any time the Plan . . . and/or any Benefit Program. No benefit described in the Plan will be considered to 'vest.' [¶] The Plan is governed by a Federal law (known as ERISA) . . . . This is a change from the status of benefits provided by the [University], which may have been subject to the 'vested rights doctrine' or similar doctrines, which limit certain benefit plan changes."

In 2010, Retirees filed a petition for writ of mandate against the Regents. The operative petition alleges, on behalf of Retirees and a putative class, impairment of an implied contract (Cal. Const., art. I, § 9) and other claims.[1] The petition alleges the LLNS health plan "has significant disadvantages and no comparable new advantages, when compared with the University-provided retiree medical benefit plan," and seeks a writ of mandate restoring Retirees and putative class members to University-sponsored group health insurance. It also seeks money damages.

The trial court sustained the Regents' demurrer and this court reversed. (*Requa v. Regents of University of California* (2012) 213 Cal.App.4th 213 (*Requa*).)[2] With respect to the implied contract claim, we explained: "[T]he essential allegations of Retirees'

---

[1] Because class certification is not at issue with respect to the petition's other causes of action, we omit facts relating to them.

[2] The lead named petitioner subsequently withdrew for medical reasons.

2

claim of implied contract were that the Regents authorized University-sponsored group health insurance coverage for retirees, and then during Retirees' employment at Livermore, the Regents—through various benefit booklets and handbooks published by their authorized representatives—offered to provide Retirees with University-sponsored group health plan coverage when they retired. [Citations.] Retirees allegedly accepted this offer through working at Livermore and continuing to provide services over time, and they claim they remained there because of the promise they would have University-sponsored group health plan coverage in retirement. [Citation.] The booklets and handbooks informed University employees that they could continue their University-sponsored group health insurance coverage after they retired, provided they met certain eligibility criteria. Retirees alleged that they met these criteria at all relevant times. [¶] . . . The foregoing allegations suffice to plead a cause of action based on an implied contract." (*Id.* at pp. 227–228.)

After remand, in 2014, the trial court granted Retirees' motion for class certification with respect to the implied contract claim, rejecting the Regents' argument that individualized issues predominate. The court noted the University's statements about retiree health benefits "do not vary materially" and its "conduct was uniform as to Retirees, as a group." Although the Regents began to include "certain disclaimers and caveats" in the 1980s, these statements again "did not vary by individual retiree and generally included the same content" and will therefore "present common legal issues," or could be addressed by creating a "subgroup of Retirees who were hired after the Regents started to use such disclaimers." The court certified a class of retirees and their eligible spouses and dependents. Notice was sent to approximately 9,000 class members.[3]

---

[3] Two rounds of notice were sent because the initial class list was incomplete. The reason the initial list was incomplete—an issue disputed by the parties—is not relevant to this appeal.

3

The trial court subsequently adopted a trial plan proposed by the Regents, which identified the following five issues for resolution: (1) Were the Regents authorized to enter into bilateral contracts governing the employment relationship; (2) Did the Regents enact legislation clearly evincing an intent to create private contract rights; (3) Did the parties' conduct show the formation of an implied contract; (4) Does any such contract include the promise that Retirees would remain in health insurance "pools" with University employees; and (5) Has any such contract been unconstitutionally impaired.

In 2015, following a bifurcated bench trial on the first two issues, the trial court issued a statement of decision finding the Regents were authorized to enter into contracts governing employment relations and enacted legislation evincing an intent to create private contract rights.  The court found the Regents issued a resolution in 1961 authorizing "the President [of the University] to establish, procure funding for, and administer a group health insurance program for University employees and retirees." This authorization followed "years of careful deliberation" during which "the Regents were expressly advised of the financial risks associated with including retirees in the program," as well as the potential recruitment benefits; "originally contemplat[ed] excluding retirees from medical coverage"; but "ultimately changed course to include 'annuitants.' "  Subsequently, "the Regents (through their authorized representatives) repeatedly and consistently, over the course of several decades, offered retirement medical benefits to current employees, stated that the same medical benefits would be available after retirement, subject only to certain criteria not at issue in this case, and represented that employees who cease work because of retirement 'may continue their coverage.' "  "None of these booklets [issued by the University] contained any relevant reservation of rights" until the 1980s.  "The Regents produced no evidence to show that the Regents notified anyone that these benefits were a mere statement of Regental 'policy' that could be changed at any time."  In addition, the University repeatedly "acknowledged that retirement benefits - including retiree health - are part of the total compensation package, have contributed to the high caliber of [University] staff, and have been critical to [University's] ability to recruit and retain qualified staff."

4

Accordingly, "the University and Petitioners reasonably understood that the University offered employee benefits, including retiree health coverage, to prospective and existing employees in exchange for their agreement to accept and remain in employment with the University."

Following this statement of decision, Retirees submitted a proposed trial plan for the remaining issues. To prove contract formation and terms, Retirees intended to present, in addition to documentary evidence, testimony of ten named petitioners about their personal awareness and understanding of the Regents' provision of retiree health benefits, including what they were told by human resources representatives and whether they were aware of representations in benefits booklets or brochures. With respect to impairment, Retirees stated their position that they could prove impairment without proving economic damages, noting evidence that LLNS benefits are terminable at any time and the LLNS retiree health plan is a separate risk pool of retirees only.

Retirees' trial plan also proposed to prove money damages on a classwide basis. Under Retirees' plan, money damages consisted of higher monthly premiums and higher out-of-pocket costs (i.e., co-payments and deductibles), which would be determined separately. Damages from higher premiums would be determined either by "mapping" LLNS plans (of which there were several) to the most comparable University-sponsored plan and calculating the net premium difference, or by calculating the difference in employer contributions. Damages from increased out-of-pocket costs depend on class members' utilization of health care. Retirees proposed to approximate the aggregate damages using generally accepted health care utilization data, and then have class members submit claims for actual incurred costs with any remainder to revert to the University.

Following Retirees' submission of this trial plan, the Regents filed a motion to decertify the class, and the trial court granted the motion in the appealed-from order. The court found "individual questions concerning the formation and terms of the alleged implied contract for each class member predominate. . . . [¶] Here, [Retirees] argue that their implied contract with [the Regents] is based on language in benefit booklets issued

5

by [the University] (of which there were at least 136 in the fifty years before 2007); on oral representations by [University] and [Livermore] personnel; and on [Retirees'] understanding that they would be entitled to [University]-sponsored health plans after retirement because other [Livermore] retirees were receiving them at the time. [Retirees] have not established that all 9000 putative class members received or read the benefit booklets, or that all the benefit booklets contained the same language concerning any right to [University]-sponsored health benefits over that fifty year period. (For example, [Retirees] admit that beginning in 1990, the benefit booklets made it clear that all benefits were subject to change or termination at any time by [the University].) Nor have [Retirees] established that all 9000 putative class members were orally promised by [University] or [Livermore] personnel a right to receive [University]-sponsored health benefits in perpetuity after retirement. . . . Finally, any understandings of the various putative class members as to their right to [University]-sponsored health benefits after retirement, based on their personal observations or information received from other [Livermore] retirees, necessarily involves individual factual questions not subject to classwide proof. [Citation.] In short, the Court concludes that, in considering the totality of the circumstances that would give rise to the alleged implied contract between [the University] and each of the 9000 putative class members, what those individual putative class members read, were told, or otherwise understood concerning their right to [University] health benefits after retirement involves individual factual questions not subject to classwide proof."

The court also found individual questions predominate "as to whether each putative class member has in fact been damaged by [the Regents'] actions. Whether the putative class members have been damaged by being provided with health plans sponsored by LLNS rather than [University]-sponsored health plans depends on a number of individualized factors, including the employer contribution to the member's health plan, what services are provided, the policy limits, the amount of deductibles and copays, and any geographic market factors affecting the cost of health care services. . . . [I]n some cases the putative class members may incur less out of pocket expenses under the

6

LLNS sponsored policies than under the [University] sponsored policies, depending on how much and what type of medical care the member uses. . . . [¶] The Court rejects [Retirees'] argument that they can demonstrate classwide impairment without demonstrating any monetary damages at all. If class members did not suffer any actual economic damage from [the Regents'] alleged impairment of their implied contract rights, they cannot prevail on that claim." The court rejected Retirees' contention that "the possibility that their insurance benefits provided by LLNS could be terminable at any time is by itself a sufficient form of damage to pursue their claim for breach of implied contract" because "the same is true of [University] insurance benefits."

In addition to the predominance of individual issues, the court found Retirees' trial plan "highly problematic" because it sought to "prove [the Regents'] liability using only the testimony of" ten individuals without showing they "had experiences typical of the entire 9000 member class (as to either implied contract formation or resulting damages) so that the Court could extrapolate classwide liability on the basis of those ten individuals' testimony." The court also found Retirees' plan to prove out-of-pocket expenses "does not appear valid" because they "cannot prove their own damages by relying on data concerning health care expenses of nonparties."

DISCUSSION

I. *Standard of Review*

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.]

7

We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 (*Brinker* ).) The same standards apply to decertification orders. (*Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1360–1361.)

II. *Predominance of Common Issues*

"The party advocating class treatment must demonstrate," among other factors, " ' "predominant common questions of law or fact . . . ." ' " (*Brinker, supra,* 53 Cal.4th at p. 1021.) "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Id.* at pp. 1021–1022.)

A. *Implied Contract Formation and Terms*

Retirees challenge the trial court's determination that individual issues predominate on the question of contract formation and contract terms. Retirees contend this finding rested on an erroneous legal assumption, to wit, that each class member must prove their personal awareness of the offered retiree health benefits. On the facts presented by this case, we agree.

"Generally, the terms and conditions of public employment are not protected by the contract clause because they are controlled by statute or ordinance, not by contract." (*Deputy Sheriffs' Assn. of San Diego County v. County of San Diego* (2015) 233 Cal.App.4th 573, 578 (*Deputy Sheriffs*).) Nonetheless, " '[p]ublic employment gives rise to certain obligations which are protected by the contract clause of the Constitution . . . .' [Citations.] Promised compensation is one such protected right. [Citation.] Once vested,

8

the right to compensation cannot be eliminated without unconstitutionally impairing the contract obligation." (*Olson v. Cory* (1980) 27 Cal.3d 532, 538 (*Olson*).) Because "vesting is simply a matter of the parties' intent . . . , public employee benefits may become vested by implication in appropriate circumstances." (*Requa, supra,* 213 Cal.App.4th at p. 226.) Retiree health care benefits can be such a contractually vested right. (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1176 (*Retired Employees*); *Requa, supra,* 213 Cal.App.4th at pp. 227–228; *Thorning v. Hollister School Dist.* (1992) 11 Cal.App.4th 1598, 1605–1609 (*Thorning*).)

"A contract is either express or implied. [Citation.] The terms of an express contract are stated in words. [Citation.] The existence and terms of an implied contract are manifested by conduct. [Citation.] The distinction reflects no difference in legal effect but merely in the mode of manifesting assent. [Citation.] Accordingly, a contract implied in fact 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' " (*Retired Employees, supra,* 52 Cal.4th at p. 1178.) "[I]t is the 'nature of [an implied-in-fact] contract' that it must be determined from the 'totality of the circumstances.' " (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 337 (*Guz*).) Our Supreme Court has "identified several factors, apart from express terms, that may bear upon 'the existence and content of an . . . [implied-in-fact] agreement' " in an employment relationship, including " ' "the personnel policies or practices of the employer, . . . actions or communications by the employer . . . , and the practices of the industry in which the employee is engaged." ' " (*Id.* at pp. 336–337, italics omitted.) "Every case thus turns on its own facts." (*Id.* at p. 337.)

The facts in this case, as the trial court found in its statement of decision on the first two bifurcated issues, are that the Regents, through employee benefits booklets, "repeatedly and consistently, over the course of several decades, offered retirement medical benefits to current employees, stated that the same medical benefits would be available after retirement, subject only to certain criteria not at issue in this case, and represented that employees who cease work because of retirement 'may continue their

9

coverage.' "[4] Retirees assert the formation of an implied contract can be proven by the booklets' language—which they claim is an unequivocal offer to provide retiree health benefits—and class members' acceptance of this offer through their employment. Our question is whether, as the trial court asserted, the analysis requires an inquiry into what "each of the 9000 putative class members . . . read, were told, or otherwise understood concerning their right to [University] health benefits after retirement."

Retirees rely heavily on *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809 (*Kashmiri*), in which the University issued written statements on its websites and in its catalogues promising not to raise certain fees for the duration of each student's enrollment, and then raised the fees. (*Id.* at pp. 815–818.) The Court of Appeal concluded an implied contract had formed between the University and a class of all affected students: "Since the language regarding the [fee] in the catalogues and on the website is unequivocal, the reasonable expectation of the parties would be that once the student enrolls in the University and the University accepts his or her payment of the [fee], the [fee] will remain the same for the duration of the student's enrollment in that program." (*Id.* at p. 833.) As Retirees' note, *Kashmiri* found an implied contract without considering whether each class member read the language on the website or in the catalogue or what each class member actually understood regarding the fee.[5]

In *Guz,* our Supreme Court indicated a similar analysis applied, under appropriate facts, to implied employment contracts. The plaintiff claimed an implied contract to be terminated only for good cause, relying on the employer's written personnel documents.

---

[4] The court noted that the booklets began to include a reservation of rights beginning in the 1980s. Although the decertification order found Retirees had not shown all the booklets contained the same language, it referred only to language added in 1990. We discuss the relevance of this change to the predominance analysis below.

[5] The Regents assert it was stipulated in *Kashmiri* that the students read the written promises. We agree with Retirees that the case does not so indicate. Although the parties stipulated to most of the facts, the court's recitation of facts sets forth the language of the promises but makes no statement about whether or how widely the promises were read. (*Kashmiri, supra,* 156 Cal.App.4th at pp. 815–817 & fn. 1.)

(*Guz, supra,* 24 Cal.4th at p. 338.)  The Supreme Court discussed a longstanding principle that " 'implied employment contract terms may arise from the employer's official . . . policies and practices . . . . [¶] When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely." (*Id.* at p. 344.)  The court did not suggest that, in such cases, each employee must prove their actual awareness or understanding of the written policies.

*Requa,* our prior opinion in this case, also suggests such an analysis.  We concluded Retirees' sufficiently pled an implied contract claim by alleging "the Regents authorized University-sponsored group health insurance coverage for retirees"; "during Retirees' employment at Livermore, the Regents—through various benefit booklets and handbooks published by their authorized representatives—offered to provide Retirees with University-sponsored group health plan coverage when they retired"; and Retirees "accepted this offer through working at Livermore and continuing to provide services over time . . . ." (*Requa, supra,* 213 Cal.App.4th at pp. 227–228.)  Although we noted the individual petitioners alleged they remained at Livermore "because of the promise they would have University-sponsored group health plan coverage in retirement," we did not suggest such an allegation was necessary.  (*Id.* at p. 228; see also *id.* at p. 226 [agreeing with Retirees' contention that "the University's obligation to provide lifetime retiree medical benefits to them on the same terms as other University retirees may be implied from the authorization of those benefits in 1961, the uninterrupted provision of those benefits for more than 50 years, and from the University's publications assuring employees they would receive health benefits in retirement so long as they met certain eligibility requirements"].)

Numerous other cases involving public employment compensation terms indicate an implied contract is formed through the employer's offer of the term, the employer's intent to be contractually bound by the offer, and the employee's performance of services.  They contain no suggestion that each employee must prove personal knowledge

11

of the term in order to establish a contractual right.  (See *Olson, supra,* 27 Cal.3d at p. 540 ["a public employee's pension rights are . . . a vested contractual right accruing upon acceptance of employment"]; *Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 ["A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment."]; *Fry v. City of Los Angeles* (2016) 245 Cal.App.4th 539, 549–550 [" 'with regard to at least certain terms or conditions of employment that are created by statute, an employee who performs services while such a statutory provision is in effect obtains a right, protected by the contract clause, to require the public employer to comply with the prescribed condition' " (italics omitted)]; *Deputy Sheriffs, supra,* 233 Cal.App.4th at p. 578 [" 'once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights arising from the legislative provisions that establish the terms of the employment relationship—rights that are protected by the contract clause of the state Constitution from elimination or repudiation by the state' "]; *California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 383 [" 'By entering public service an employee obtains a vested contractual right to earn a pension on terms substantially equivalent to those then offered by the employer.' "]; *Thorning, supra,* 11 Cal.App.4th at p. 1605 ["elements of compensation for an elected officer become contractually vested upon acceptance of employment"].)

The Regents' authority is not to the contrary.  They cite contract cases outside of the employment context, in which individualized determinations were clearly necessary. *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442 involved a bank loan contract specifying a "per annum" interest rate; the bank in fact calculated the interest on the basis of a 360-day year.  (*Id.* at pp. 446–447.)  Such a calculation was an "industry-wide banking practice" which had been followed for many years and the bank "freely explained" the term when asked; the trial court thereby found " 'a number of' the estimated 50,000 class members" would have known what the term meant.  (*Id.* at pp. 445, 448.)  Because a borrower "who *had* full knowledge of the meaning of the 'per

annum' interest rate in the contract provision, could not prevail in such a breach of contract action," individualized issues precluded class certification. (*Id.* at p. 448.) In *Hamwi v. Citinational-Buckeye Inv. Co.* (1977) 72 Cal.App.3d 462, commercial tenants alleged breach of a lease provision. (*Id.* at pp. 466–467.) Because the relevant provision was ambiguous and was "individually discussed" and "individually negotiated" by the putative class members, individual issues barred class certification. (*Id.* at pp. 465–466, 473.)[6]

To be sure, " '[c]ourts seek to enforce the *actual* understanding' of the parties to an employment agreement.' " (*Guz, supra,* 24 Cal.4th at p. 337.) However, we conclude that, where an employer issues a written policy intended to inform employees about contractual terms applicable to their employment, an employee's understanding of the employer's offer can be inferred without requiring individualized proof. (*Id.* at p. 344 ["When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, *a strong inference may arise* that the employer intended workers to rely on these policies as terms and conditions of their employment, and *that employees did reasonably so rely*." (italics added)]; see also *Olson, supra,* 27 Cal.3d at p. 539 ["A judge entering office *is deemed to do so* in consideration of—at least in part—salary benefits then offered by the state for that office." (italics added)].) Accordingly, the trial court erred in concluding an individualized inquiry was necessary.[7]

---

[6] The Regents also rely on cases involving non-contract claims. These cases, which stand for the unremarkable proposition that class certification is properly denied when individualized issues predominate, do not impact our analysis. (See *Hataishi v. First American Home Buyers Protection Corporation* (2014) 223 Cal.App.4th 1454, 1457, 1467–1468 [claim under Pen. Code, § 632, prohibiting recording confidential communications without the consent of all parties]; *Kight v. CashCall, Inc.* (2014) 231 Cal.App.4th 112, 116, 130 [same]; *Davis-Miller v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 106, 121 [claim for fraudulent business practice based on alleged misrepresentations].)

[7] The Regents note the booklets' language changed beginning in the 1980s (a change also noted in the statement of decision on the first two bifurcated issues), and the

13

B. *Impairment*

As an alternative ground for denying certification, the trial court found individual issues predominate on the question of impairment because the determination of actual economic damages requires individualized inquiry. Retirees challenge the finding that economic damages require individualized inquiry, and also argue the trial court's conclusion that economic damages are a necessary element to an impairment claim is an erroneous legal assumption. We agree with the second, but not the first, contention.

1. *Economic Damages*

As noted above, the trial court found: "Whether the putative class members have been damaged by being provided with health plans sponsored by LLNS rather than [University]-sponsored health plans depends on a number of individualized factors, including the employer contribution to the member's health plan, what services are provided, the policy limits, the amount of deductibles and copays, and any geographic market factors affecting the cost of health care services. . . . [I]n some cases the putative class members may incur less out of pocket expenses under the LLNS sponsored policies than under the [University] sponsored policies, depending on how much and what type of medical care the member uses."

The Regents submitted a declaration from Michael Baptista, the Executive Director of the University's Human Resources — Benefits Program and Strategy

decertification order notes a language change in 1990. Retirees' theory is that their contractual right to retiree health insurance vested when they accepted employment, and thus any change during the term of their employment cannot alter that vested right. This theory presents a common question. (See *Brinker, supra,* 53 Cal.4th at p. 1021 [predominance "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment' "].) We note that, to the extent class members were hired after any material change in language, it may be appropriate to create a subclass of employees hired after the language change. The Regents also argue benefits counselors orally told employees retiree health benefits were not a vested promise; the record citations provided refer to such representations in the 1980s or later. We express no opinion as to whether such oral representations preclude classwide determination of contract formation for a subclass of employees hired after this time.

14

Department.  Baptista averred: "Based on my experience administering the University's health insurance benefits program, the premiums and out-of-pocket costs for an insurance plan are inter-related.  The factors that determine how much an insured individual will pay for healthcare (*i.e.*, insurance premiums, deductibles and co-pays, and costs of uncovered services) are complex and inter-dependent.  For example, other things being equal, a plan with higher premiums should have lower deductibles, lower co-pays, or cover more extensive types of healthcare services or some combination of these terms.  Analyzing the cost-benefit balance for any given plan requires consideration of several inter-related variables, including (i) the employer's contribution to the plan, (ii) the structure of the insurance plan (i.e. what services are covered or excluded, cost sharing in terms of deductibles, co-pays, coinsurances, out-of-pocket maximums, and policy limits, etc.), (iii) the risk profile of the insured population, (iv) geographic market factors affecting the cost of health care services . . . , and (v) in the case of HMOs and PPOs, the efficiencies of the insurer's provider network.  In addition, the amount that an insurer charges for a given plan is a function not just of the risk profile of the insured population, but also the structure of the plan, the level and types of benefits offered, and geographic factors affecting the cost of health care services in a particular market.  The overall economic 'cost' to an individual is not reducible to premiums viewed in isolation."

Baptista continued, "the overall economic cost to an individual will also be affected by the extent to which the individual has health needs that call upon the coverage afforded by his or her chosen insurance plan, *i.e.,* the individual's 'utilization' of his or her insurance plan. . . . [I]n order to make a comparison of whether the individual would have been economically better off, or worse off, under a different insurance plan, it would be necessary to understand the individual's actual utilization of healthcare services, and to compare the terms of his or her insurance plan (*i.e.*, covered services, deductibles, limits, and co-pays) to the terms of the hypothetical alternative plan.  As

with premiums, out-of-pocket utilization costs cannot be viewed in isolation in assessing the overall economic cost of different insurance plans."[8]

Baptista's declaration provides substantial evidence supporting the trial court's finding that individualized issues predominate on the question of actual economic damages. Retirees proposed to calculate damages from premium costs and out-of-pocket costs separately, but Baptista provides evidence for the finding that they must be considered together. Because, as Baptista opined, "a plan with higher premiums should have lower deductibles, lower co-pays, or cover more extensive types of healthcare services or some combination of these terms," a class member who pays more in premiums may pay less in co-pays and deductibles; calculating these separately would not accurately reflect that individual's actual damages. Retirees assert that they will be comparing comparable plans—i.e., a University plan with higher premiums and lower co-pays will be compared with an LLNS plan with higher premiums and lower co-pays—but they submit no evidence that, at all times since 2007, each LLNS plan has a sufficiently comparable University plan. In fact, they concede that one of LLNS's plans is a "gateway" plan "that provides access to approximately 300 health care plans and 380 prescription plans," which "are generally not comparable to [University] plans." Retirees' proposal to calculate premium damages by the difference between the subsidies provided by the University and LLNS fails entirely to take into account the various interdependent factors contributing to an individual's actual health care costs.

Retirees effectively concede that out-of-pocket costs based on actual use of health care requires an individualized determination; they propose a method to establish a fund based on an estimate of classwide costs, with a claims procedure for individual class members. The parties dispute the propriety of such a plan, an issue we need not decide. It is sufficient for our purposes that substantial evidence supports the trial court's finding

---

[8] Retirees argue Baptista did not claim to be an expert in evaluating their damages model. They fail to explain why such an area of expertise is necessary, in light of Baptista's stated qualifications and background on employer-sponsored group health insurance.

that the determination of economic damages from premiums and out-of-pocket costs cannot be separated, and that individual issues predominate the analysis.

However, this conclusion does not end our inquiry. " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker, supra,* 53 Cal.4th at p. 1022.) We thus turn to Retirees' argument that they can prove noneconomic impairment on a classwide basis. If so, the fact that economic damages will require an individualized analysis will not justify decertification. (See *Bluford v. Safeway Stores, Inc.* (2013) 216 Cal.App.4th 864, 873 ["Because Safeway's liability can be determined by law and facts common to all members of the class, the class will be certified even if the class members must individually prove their damages."].)[9]

### 2. *Noneconomic Impairment*

Retirees argue that impairment is not limited to actual economic damages. Retirees' theory is that their loss of an entitlement to health insurance—since LLNS insurance can be terminated at any time—constitutes substantial impairment and this issue presents a common issue.

Retirees argue several cases have found impairment absent actual economic damages to class members. For example, in *Valdes v. Cory* (1983) 139 Cal.App.3d 773 (*Valdes*), members of the Public Employees' Retirement System (PERS) challenged a state law suspending state-employer retirement contributions for three months in order to balance the budget, and directing contributions in an equivalent amount be transferred from the PERS reserve against deficiencies. (*Id.* at pp. 777–778.) The court noted: "The employee has no out-of-pocket losses from suspension of employer contributions, because PERS benefits are defined by statutory formula at the time of employment." (*Id.*

---

[9] The Regents argue that, even if actual economic injury is not required to prove an impairment claim, Retirees seek damages and therefore must prove them. To be sure, Retirees must prove economic damages to recover them. But if they can prove liability on a classwide basis, their claim for damages will not defeat class certification.

17

at p. 785.) Nonetheless, the court concluded "the interest of the employee at issue here is in the security and integrity of the funds available to pay future benefits," and the law "substantially impairs public employees' assurance that they will ultimately receive the retirement benefits to which they become entitled." (*Id.* at pp. 785, 790.)

In *Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012 (*Genest*), a state law reduced the state's contributions to a teachers' supplemental retirement benefits fund for that year by $500 million, with a "contingent obligation to transfer this sum to the [fund] over a 33–year period, conditioned upon a determination by an actuary establishing that this sum or any portion thereof is needed to meet the . . . benefit obligations in any year between 2006 and July 2036, which determination must be certified by [the Department of Finance]." (*Id.* at p. 1024.)[10] At the time the challenged law was enacted, the Legislature found the fund currently had sufficient funds to meet its obligations through 2035. (*Ibid.*) The court found the state was contractually obligated to contribute a specified level of funding, regardless of the actuarial soundness of the fund. (*Id.* at p. 1030.) The court concluded the challenged law impaired this contract: "reducing the income stream available to pay the supplemental benefits by $500 million increases the risk to [retirement system] members that the [supplemental] funds will be insufficient to make the supplemental benefit payments in the future. [The state law] does not compensate the members for this increased risk or provide a comparable new advantage in place of the $500 million. As a result, [the state law] impairs the contractual rights [of teachers] . . . in violation of the state and federal Constitutions." (*Id.* at p. 1039.)

In *United States Trust Co. v. New Jersey* (1977) 431 U.S. 1, New York and New Jersey enacted laws limiting the ability of the Port Authority to use revenues or reserves for purposes other than as security for Port Authority bonds. (*Id.* at pp. 9–10.) The

---

[10] The supplemental fund provided an additional payment "to retirees whose current defined benefit program allowance has fallen below 80 percent of the purchasing power of the initial allowance due to inflation." (*Genest, supra,* 154 Cal.App.4th at p. 1021.)

express purpose of the statutes was to increase investor confidence. (*Id.* at p. 9.) Subsequently, the states retroactively repealed these laws. (*Id.* at p. 14.) After finding the initial laws created contractual obligations, the Supreme Court considered the impact of their repeal on bondholders. (*Id.* at pp. 18–19.) There was conflicting evidence about the effect of the repeal on the secondary market for Port Authority bonds. (*Id.* at p. 19.) The court did not indicate any resulting inability to redeem matured bonds. (See *id.* at p. 41 (dis. opn. of Brennan, J.) ["No creditor complains that public authorities have defaulted on a coupon payment or failed to redeem a bond that has matured."].) Nonetheless, the Supreme Court found the repeal impaired the states' obligations to bondholders: "As a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion. Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the States' contract." (*Id.* at p. 19.)

Although the impairment in these cases related to money, as the Regents note, the impairment was not actual economic damage to the affected individuals, but rather the loss of a security or assurance for a future entitlement. We agree with Retirees that these cases demonstrate actual economic damages are not necessary to show impairment of contract. Therefore, class members need not prove actual economic damages in order to prove a claim for impairment.

The Regents dispute Retirees' theory that that the loss of their entitlement to health insurance constitutes substantial impairment, arguing the asserted noneconomic injury is too speculative for mandamus relief and LLNS and/or the federal government are obligated to provide class members with health insurance. We need not and do not decide these issues. It is sufficient for present purposes that they present common, not individual, questions. (See *Brinker, supra,* 53 Cal.4th at p. 1025 ["To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them. Out of respect for the problems arising from

one-way intervention, however, a court generally should eschew resolution of such issues unless necessary."].)[11]

In sum, we conclude the trial court's conclusion that Retirees must prove they suffered actual economic damage in order to prove their impairment claim was erroneous. A noneconomic impairment can constitute impairment. Retirees claim such an impairment because their current health benefits can be terminated at any time. This presents a common question. The predominance of individualized issues on class members' actual economic damages is not a basis to decertify the class for liability purposes.

III. *Class Plan Manageability*

In addition to finding individual issues predominate, the trial court found Retirees' trial plan proposed to prove liability for a 9,000 member class based on the testimony of 10 individuals, and thereby relied on an impermissibly small and nonrandom sample. (See *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 13 (*Duran*) ["A trial plan that relies on statistical sampling must be developed with expert input and must afford the defendant an opportunity to impeach the model or otherwise show its liability is reduced."].)

As noted above, Retirees' trial plan relied in part on the testimony of ten individuals about their personal awareness and understanding of the Regents' provision of University-sponsored health insurance in retirement, what they were told by human resources representatives, and whether they were aware of representations in benefits booklets or brochures. On appeal, Retirees assert that they "never sought to use statistical evidence to establish liability and never planned to use themselves as a self-selected

---

[11] We note that the trial court's decertification order found the University benefits were also terminable at any time. Although we must defer to factual findings supported by substantial evidence, this is not a finding of fact but rather a legal conclusion: Retirees' implied contract claim asserts that the University cannot terminate retiree health insurance benefits because to do so would substantially impair the implied contract term promising such benefits.

'random sample,' " and instead intend to "establish liability based on the Regents' promise of University-sponsored benefits and the unilateral termination of these benefits" when LLNS took over management of Livermore. Retirees fail to explain the relevance of the individual testimony proposed in their trial plan. Nonetheless, in light of Retirees' representation that they do not intend to prove classwide liability based on such individual testimony, and in light of our conclusion that such testimony is not necessary to establish liability in this case on the record before us (see *ante,* part II.A), *Duran* does not preclude classwide determination of liability.[12]

## DISPOSITION

The order granting the Regents' motion to decertify the class is reversed and remanded with directions to the trial court to deny the motion. Retirees are awarded their costs on appeal.

---

[12] The trial court also found Retirees' plan to prove out-of-pocket damages on a classwide basis invalid. As noted above (*ante,* part II.B.1), we need not decide the validity of Retirees' proposed method. We also need not decide Retirees' alternative arguments that the decertification order was procedurally improper.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A153386)

Superior Court of Alameda County, No. RG10530492, Hon. George C. Hernandez, Jr., Judge.

Sinclair Law Office, Andrew Thomas Sinclair; Carter, Carter Fries & Grunschlag, Dov M. Grunschlag; Calvo Fisher & Jacob, Kathleen V. Fisher, Rodney J. Jacob, and Alexander M. Freeman, for Plaintiffs and Appellants.

Crowell & Moring, J. Daniel Sharp, Joshua Thomas Foust, and Christopher Cadena; University of California Office of the General Counsel, Charles F. Robinson, Margaret L. Wu, and Allison M. Woodall, for Defendant and Respondent.