Filed 9/25/24 Certified for Publication 10/23/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| AZEEM BATH et al., <br><br>　　　Plaintiffs and Appellants, <br>v. <br><br>STATE OF CALIFORNIA et al., <br><br>　　　Defendants and Respondents. | A167908 <br><br>(Solano County Super. Ct. No. FCS058670) |

Plaintiffs are employees of the State of California who provide dental care to inmates in the state prison system; their employment is governed by a memorandum of understanding (MOU).  Plaintiffs have sued the state and related defendants seeking compensation for time they have spent on "pre- and post-shift safety and security activities," such as going through security and picking up and returning alarm devices.

Defendants filed a demurrer, which the trial court sustained without leave to amend on the ground these activities are not compensable under the Portal-to-Portal Act of the Fair Labor Standards Act.  After judgment was entered, plaintiffs appealed.

Plaintiffs contend they have alleged viable wage claims and the trial court improperly decided a disputed question of fact in ruling on the demurrer.  Defendants respond that the trial court did not err, and, in any event, the judgment may be affirmed on alternative grounds they raised in

1

their demurrer.  Specifically, defendants argue the MOU governing the terms and conditions of plaintiffs' employment precludes their claims; plaintiffs' statutory claims fail because the statutes at issue do not apply to government employers; the claims are all subject to dismissal because plaintiffs failed to exhaust their contractual remedies (grievance and arbitration procedures in the MOU); and the claims are all barred by the applicable statute of limitations.

We conclude defendants' demurrer is well taken as to plaintiffs' statutory claims, but plaintiffs have stated a claim for breach of contract.  We further conclude that defendants' affirmative defense of failure to exhaust contractual remedies cannot be resolved in a demurrer and plaintiffs' contract claim is not time barred.  Accordingly, we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Azeem Bath, Megan Roberts, and Makisha Bomar are hourly paid, non-exempt employees who work at an adult state prison.  Bath is a dental hygienist, Roberts and Bomar are dental assistants, and they all are currently assigned to the California Medical Facility.  The defendants are the State of California, California Department of Correction and Rehabilitation (CDCR), California Correctional Health Care Services, and California Department of Human Resources (CalHR).

*Memorandum of Understanding and the Governing Wage Law*

The parties agree that plaintiffs' union and the State of California entered a memorandum of understanding governing the terms and conditions of plaintiffs' employment and that the MOU incorporates the Fair Labor Standards Act of 1938 (FLSA), as amended by the Portal-to-Portal Act (29 U.S.C. § 251 et seq.).  Plaintiffs further acknowledge that it is the FLSA that

2

"determine[s] whether activities performed by Plaintiffs are compensable." We therefore begin with a brief overview of the applicable wage law.

The Portal-to-Portal Act of the FLSA "exempt[s] employers from liability for future claims based on two categories of work-related activities as follows: [¶] '(a) Except as provided in subsection (b) [which covers work compensable by contract or custom], no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer . . . to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after the date of the enactment of this Act—

" '(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

" '(2) activities which are *preliminary to or postliminary* to said *principal activity or activities*,

" 'which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.' § 4, 61 Stat. 86–87 (codified at 29 U.S.C. § 254(a))." (*Integrity Staffing Solutions, Inc. v. Busk* (2014) 574 U.S. 27, 32–33 (*Integrity Staffing*), italics added.)

"As the statute's use of the words 'preliminary' and 'postliminary' suggests, § 254(a)(2), and as [United States Supreme Court] precedents make clear, the Portal-to-Portal Act of 1947 is primarily concerned with defining the beginning and end of the workday. [Citation.] It distinguishes between activities that are essentially part of the ingress and egress process, on the one hand, and activities that constitute the actual 'work of consequence

3

performed for an employer,' on the other hand.  29 CFR § 790.8(a); see also *ibid.* (clarifying that a principal activity need not predominate over other activities, and that an employee could be employed to perform multiple principal activities)."  (*Integrity Staffing*, *supra*, 574 U.S. at p. 38 (conc. opn. of Sotomayor, J.).) [1]

The phrase " ' "principal activity or activities" ' " includes " 'all activities which are an "integral and indispensable part of the principal activities." ' " (*Integrity Staffing*, *supra*, 574 U.S. at p. 33.)  It is not enough to show "an employer required an activity" or "the activity is for the benefit of the employer."  (*Id.* at p. 36.)

*First Amended Complaint*

In November 2022, plaintiffs filed a first amended complaint against defendants styled as a class action.[2]  They asserted four causes of action: (1) failure to pay California minimum wage in violation of Labor Code[3]

---

[1] The Portal-to-Portal Act "does not affect the computation of hours worked within the 'workday' proper, roughly described as the period 'from whistle to whistle,' and its provisions have nothing to do with the compensability under the Fair Labor Standards Act of any activities engaged in by an employee during that period. . . .  Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted."  (29 C.F.R. § 790.6(a), fns. omitted.)  In other words, once an employee engages in a principal activity, the compensable workday has started.

[2] The class and class members plaintiffs "seek to represent are all former and current hourly paid, non-exempt employees of Defendants who perform or have performed, without pay or other compensation, pre- and post-shift activities at one or more adult and youth prisons located in the State of California."

[3] Further undesignated statutory references are to the Labor Code.

4

sections 1182.11, 1182.12. and 1194, (2) failure to pay overtime wages in violation of section 1194, (3) failure to pay wages and/or overtime in breach of common law contractual obligations, and (4) failure to pay wages in violation of section 222.

Plaintiffs alleged, "a principal activity [of their employment and that of all class members] is to provide safety and security for all prison occupants." (Capitalization and bolding deleted.) They continued, "California Prisons present multiple dangers and safety concerns that are not present in the average workplace," and given the risks, plaintiffs (and putative class members) "are specially employed to focus on and promote the security and safety of staff, visitors, and inmates."[4]

Plaintiffs alleged the uncompensated "Pre-Shift Work" that they and other class members perform compromises the following five activities: (1) "The Security Checkpoint"—at the front gate of a prison, presenting their identification cards to security officers and opening their bags for visual inspections; (2) "The First Sally Port"—walking to a sally port, waiting to enter, and then waiting for the guard to open the gate; (3) "Collecting Work Specific Tools and Equipment"—walking to an administrative building,

---

[4] In support of the allegation that they were specially employed to provide security, plaintiffs alleged the CDCR Operations Manual "contains a host of safety regulations and directives that must be followed by all of Defendants' employees," and the Code of Regulations "similarly contain[s] a number of employee directives regarding prison safety and security," including the provision, "The requirement of custodial security and of staff, inmate and public safety must take precedence over all other considerations in the operation of all the programs and activities of the institutions of the department." (Quoting Cal. Code Regs., tit. 15, § 3270, underscoring deleted.) The regulations also provide that " '[e]very employee, regardless of his or her assignment, is responsible for the safe custody of the inmates confined in the institution of the department.' " (Quoting Cal. Code Regs., tit. 15, § 3271.)

5

picking up an alarm device and, if necessary, keys; (4) "The Control Sally Port"—"proceed[ing] to a second sally port to enter the mainline prison premises" and, again, showing their identification cards; and (5) "Walking to the Department and Signing In"—walking to their assignment area. When they arrive at their assignment area, they sign in "by reporting the precise time they arrive." According to plaintiffs, these preshift activities generally take 10 to 15 minutes and sometimes take 20 minutes, and their "Post-Shift Work" involves "many of the same activities and functions . . . but in reverse" and takes a similar amount of time.

*Demurrer and Court Ruling*

In January 2023, defendants filed a demurrer to the first amended complaint. On April 21, 2023, the trial court issued a written ruling sustaining the demurrer to plaintiffs' first amended complaint without leave to amend.

The trial court reasoned, "[D]espite Plaintiffs' attempt to claim that one of their principal activities is to 'provide safety and security for all prison occupants' (see, FAC, ¶¶ 22-35), the productive work Plaintiffs are employed to perform is dental care, not the security of the prison. The bag checks, security screenings, and collection and return of alarm devices and other equipment are not closely related activities integral and indispensable to the performance of dental care. Consequently, these activities are not compensable under the FLSA and the Portal-to-Portal Act." This reasoning disposed of all of plaintiffs' claims, and the trial court did not address the other grounds defendants argued for sustaining their demurrer.

6

# DISCUSSION

A. *Standard of Review*

The law governing our review of a ruling on a demurrer is well-established. "[W]e examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*McCall v. PacifiCare of California, Inc*. (2001) 25 Cal.4th 412, 415.) "[W]e accept as true even the most improbable alleged facts, and we do not concern ourselves with the plaintiff's ability to prove its factual allegations." (*Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1406.) On the other hand, we need not accept "contentions, deductions, or conclusions of fact or law." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) "We may also consider matters subject to judicial notice." (*Ibid*.)

"A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)

B. *Relevant Law*

1. <u>The Purpose of the Portal-to-Portal Act of the FLSA</u>

As we have seen, the Portal-to-Portal Act exempts from compensation "activities which are preliminary to or postliminary to [the] principal activity or activities," "which [an] employee is employed to perform." (29 U.S.C. § 254, subd. (a).)

In *Integrity Staffing*, the Supreme Court recounted the history and purpose of the law: "Enacted in 1938, the FLSA established a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek. [Citation.] An employer who violated these provisions could be held civilly liable for backpay, liquidated damages, and attorney's fees.

7

[Citation.] [¶] But the FLSA did not define 'work' or 'workweek,' and this Court interpreted those terms broadly. It defined 'work' as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.' [Citation.] Similarly, it defined 'the statutory workweek' to 'includ[e] all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace.' [Citation.] Applying these expansive definitions, the Court found compensable the time spent traveling between mine portals and underground work areas, [citation], and the time spent walking from timeclocks to work benches, [citation].

"These decisions provoked a flood of litigation . . . [seeking] nearly $6 billion in back pay and liquidated damages for various preshift and postshift activities. [Citation.] [¶] Congress responded swiftly. It found that the FLSA had 'been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers.' 29 U.S.C. § 251(a). Declaring the situation to be an 'emergency,' Congress found that, if such interpretations 'were permitted to stand, . . . the payment of such liabilities would bring about financial ruin of many employers' and 'employees would receive windfall payments . . . for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay.' §§ 251(a)-(b).

"Congress met this emergency with the Portal-to-Portal Act." (*Integrity Staffing, supra*, 574 U.S. at pp. 31–32.)

2.  Supreme Court Decisions on Compensable Activities Under the Portal-to-Portal Act

The United States Supreme Court "has consistently interpreted 'the term "principal activity or activities" [to] embrac[e] all activities which are an "integral and indispensable part of the principal activities." ' " (*Integrity Staffing, supra*, 574 U.S. at p. 33.)  The court has instructed that an activity is "integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." (*Ibid.*)

In *Integrity Staffing*, the Supreme Court described several examples of "activities that satisfy this test" based on its prior decisions.  (574 U.S. at p. 34.)  For instance, "the time battery-plant employees spent showering and changing clothes [was held compensable] because the chemicals in the plant were 'toxic to human beings' and the employer conceded that 'the clothes-changing and showering activities of the employees [were] indispensable to the performance of their productive work and integrally related thereto.' " (*Ibid.*, citing *Steiner v. Mitchell* (1956) 350 U.S. 247, 249 (*Steiner*).)  In another case, the court "held compensable the time meatpacker employees spent sharpening their knives because dull knives would 'slow down production' on the assembly line, 'affect the appearance of the meat as well as the quality of the hides,' 'cause waste,' and lead to 'accidents.' " (*Integrity Staffing*, at p. 34, citing *Mitchell v. King Packing Co.* (1956) 350 U.S. 260, 262 (*Mitchell*).)  "By contrast, [the Supreme Court] . . . held noncompensable the time poultry-plant employees spent waiting to don protective gear because such waiting was 'two steps removed from the productive activity on the assembly line.' " (*Integrity Staffing*, at p. 34, citing *IBP, Inc. v. Alvarez* (2005) 546 U.S. 21, 42.)

*Integrity Staffing* involved wage claims brought by hourly warehouse employees who "retrieved products from the shelves and packaged those products for delivery to Amazon customers." (*Integrity Staffing*, *supra*, 574 U.S. at p. 29.) These plaintiffs sought "compensation under the FLSA for the time spent waiting to undergo and actually undergoing [postshift] security screenings." (*Id.* at p. 30.) They alleged the screenings took about 25 minutes each day and "were conducted 'to prevent employee theft' and thus occurred 'solely for the benefit of the employers and their customers." (*Ibid.*)

The district court granted the employer's motion to dismiss, finding the security screenings "fell into a noncompensable category of postliminary activities," but the Ninth Circuit Court of Appeals reversed. (*Integrity Staffing*, *supra*, 574 U.S. at pp. 30–31.) The United States Supreme Court, however, granted review and reversed the Ninth Circuit.

Agreeing with the district court, the Supreme Court reasoned: "To begin with, the screenings were not the 'principal activity or activities which [the] employee is employed to perform.' 29 U.S.C. § 254(a)(1). [The employer] did not employ its workers to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment to Amazon customers.

"The security screenings also were not 'integral and indispensable' to the employees' duties as warehouse workers. . . . [A]n activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities. The screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment. And [the employer] could have eliminated the screenings

10

altogether without impairing the employees' ability to complete their work."
(*Integrity Staffing*, *supra*, 574 U.S. at p. 35.)

The court cited a Department of Labor opinion letter issued in 1951, which "found noncompensable a preshift security search of employees in a rocket-powder plant ' "for matches, spark producing devices such as cigarette lighters, and other items which have a direct bearing on the safety of the employees," ' as well as a postshift security search of the employees done ' "for the purpose of preventing theft." ' " (*Integrity Staffing*, *supra*, 574 U.S. at pp. 35–36.)  The court also explained the Ninth Circuit "erred by focusing on whether an employer *required* a particular activity.  (*Integrity Staffing*, *supra*, 574 U.S. at p. 36.)  "The integral and indispensable test is tied to the productive work that the employee is *employed to perform*.  See, e.g., *IBP*, 546 U.S., at 42; *Mitchell*, *supra*, at 262; *Steiner*, 350 U.S., at 249–251; see also 29 CFR § 790.8(a) (explaining that the term 'principal activities' was 'considered sufficiently broad to embrace within its terms such activities as are indispensable to *the performance of productive work*' (internal quotation marks omitted; emphasis added)); § 790.8(c) ('Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance' (emphasis added))." (*Integrity Staffing*, at p. 36.)

3.   Additional Case Law Considering the Compensability of
     Security Screenings Under the FLSA

In *Aguilar v. Management & Training Corporation* (10th Cir. 2020) 948 F.3d 1270 (*Aguilar*), cited by plaintiffs, detention officers who worked at a prison in New Mexico sought compensation for (among other things) time they spent undergoing security screenings when they first arrived at the prison.  (*Id*. at p. 1274.)  The district court granted the employer's motion for summary judgment, relying on *Integrity Staffing*, but the Tenth Circuit Court

of Appeals reversed, noting the Supreme Court "did not hold that a security screening can *never* be compensable." (*Id.* at pp. 1275, 1277, italics added.)

In *Aguilar*, it was undisputed that "the officers' principal activities include[d] maintaining 'the custody and discipline of inmates,' 'supervising detainees,' 'searching for contraband[,] and providing security.' " (*Aguilar, supra*, 948 F.3d at p. 1277.) Distinguishing *Integrity Staffing*, where the postshift security screenings to prevent theft were "not 'tied to' the work of retrieving items from warehouse shelves," the Tenth Circuit concluded the prison screenings "to prevent weapons and other contraband from entering the prison" were "necessarily 'tied to' the officers' work of providing prison security and searching for contraband." (*Id.* at p. 1278.) The court emphasized that "the security screening and the officers' work share the same purpose." (*Id.* at p. 1278.)[5]

On the other hand, in *Alkire, supra*, cited by defendants, a federal claims court granted the federal government's motion to dismiss prison employees' wage claims related to preshift security screening. (*Alkire, supra*, 158 Fed.Cl. at p. 399.) Accepting the plaintiffs' allegation that " 'assuring that no contraband enters the Institution' is a 'primary duty' of Prison

---

[5] The Tenth Circuit's analysis has been criticized. In *Hootselle v. Missouri Department of Corrections* (Mo. 2021) 624 S.W.3d 123, 140, the Missouri Supreme Court declined to follow *Aguilar*, observing that the Tenth Circuit's reasoning that security screenings were integral and indispensable to the principal activities because they "shared the same goals of providing prison security" was "a subtle expansion of the test formulated in [*Integrity Staffing*], and *Aguilar* cites no authority for the proposition that an activity [is] integral if it shares a common goal with the work." Similarly, in *Alkire v. United States* (Fed. Cl. 2022) 158 Fed.Cl. 380, 393 (*Alkire*), the claims court declined to follow *Aguilar*, opining that the case was wrongly decided because "[t]he question is not whether pre-shift activities align with the 'purpose' of employment."

employees," the court found, "it does not follow that *being screened* to ensure compliance with contraband rules is an intrinsic part of Plaintiffs' job." (*Id.* at p. 391.) The claims court reasoned, "Just as a theft screening is 'not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment,' [citation] [the p]laintiffs can remove contraband from the Prison, screen others for contraband, and refrain from bringing contraband in even if they themselves are not screened. . . . [The security screenings] are certainly not related in the way that sharpening a knife is connected with cutting meat, or that wearing protective gear is connected with handling dangerous chemicals." (*Id.* at p. 391 [citing *Integrity Staffing* and cases described therein].) The court further observed that its holding aligned with "the bulk of authority holding as a matter of law (either at the pleadings or at summary judgment) that pre-shift security screenings generally are not compensable." (*Id.* at p. 393 [citing cases].)[6]

While the *Alkire* court found time the prison employees spent undergoing security screening was noncompensable as a matter of law, it denied the defendant's motion to dismiss as to the employees' wage claim for time spent "donning a security belt and other gear" because "donning

---

[6] After citing nine cases in accord with its ruling, the court cited as a "but see," *Fritz v. Corizon Health, Inc.* (W.D. Mo. Jan. 31, 2020) 2020 WL 9215899, at *9 (*Fritz*), in which the district court denied a motion to dismiss wage claims involving security screening for state prison nurses. (*Alkire*, *supra*, 158 Fed.Cl. at p. 393.) In denying the employer's motion to dismiss, the district court in *Fritz* observed, "It is not apparent that Plaintiffs could dispense of each specified pre- and post-activity and still perform their alleged principal work duties without impairment," and noted that the employer "relie[d] on cases where questions of whether a given preliminary or postliminary activity is compensable were resolved at a later stage of the litigation process, not on a motion to dismiss." (2020 WL 9215899, at *9.)

specialized items necessary to job functions is generally part of an employee's principal activities." (*Alkire, supra*, 158 Fed.Cl. at p. 395.)

4.    *Stoetzl v. Department of Human Resources*

We next consider the California Supreme Court decision *Stoetzl v. Department of Human Resources* (2019) 7 Cal.5th 718 (*Stoetzl*). This case involved a class action brought by correctional employees working in state prisons who sought additional pay for time spent on various pre- and postwork activities, "including traveling from the outermost gate of the prison facility to their work posts within the facility, traveling back from their work posts to the outermost gate, being briefed before the start of a shift, briefing relief staff at the end of a shift, checking out and checking back in mandated safety equipment, putting on and removing such equipment, and submitting to searches at various security checkpoints within the facility." (*Id*. at p. 722.) The plaintiffs were divided into two subclasses, one for employees who were represented by a union and had a collective bargaining agreement and one for supervisory employees who were unrepresented. (*Id*. at p. 723.) Following a court trial on certain threshold issues, the trial court found in favor of the defendants on all claims. (*Id*. at pp. 730, 734.)

In discussing the plaintiffs' claims, our high court referred to the pre- and postwork activities as "walk time" and divided walk time into two types, "entry-exit walk time" and "duty integrated walk time."[7] (*Stoetzl, supra*, 7 Cal.5th at pp. 722–723.) The court defined entry-exit walk time as "the time a correctional employee spends after arriving at a prison's outermost gate but

---

[7] The court recognized that these two types of "walk time" "include[d] many activities besides merely walking to and from a work post." (*Stoetzl, supra*, 7 Cal.5th at p. 722.)

14

before beginning the first activity the employee is employed to perform (plus analogous time at the end of the employee's work shift)" and defined duty-integrated walk time as "the time a correctional employee spends after beginning the first activity the employee is employed to perform but before the employee arrives at his or her assigned work post (plus analogous time at the end of the employee's work shift)." (*Ibid*.) The court's definitions were purposely "designed to reflect the distinction drawn by the Portal-to-Portal Act." (*Id*. at p. 723, fn. 1.) In other words, by definition, "entry-exit walk time" referred to an employee's activities that were preliminary or postliminary to the principal activities of the employee's job (and, thus, were noncompensable under the Portal-to-Portal Act), and "duty-integrated walk time" referred to activities that occurred after the workday commenced for purposes of the FLSA (and, thus, were not subject to the Portal-to-Portal Act and required compensation).

Despite the similarities between the *Stoetzl* plaintiffs and plaintiffs in the current case, *Stoetzl* does not answer the question whether the pre- and postwork activities alleged by plaintiffs are compensable under the FLSA. This is because in *Stoetzl*, the California Supreme Court was not asked to determine which activities qualified as duty-integrated walk time (and thus were compensable under the FLSA) and which fell into the category of noncompensable entry-exit walk time. Instead, the *Stoetzl* plaintiffs argued the state minimum wage law of Wage Order No. 4 applied to them. They took this position because arguably *all* walk time, both entry-exit and duty-integrated, was compensable under the wage order. (*Stoetzl*, *supra*, 7 Cal.5th

at p. 725.) Our high court, however, held that the general state minimum wage law did not apply to the plaintiffs. (*Id*. at pp. 744, 749.)[8]

Still, the case illustrates the kinds of work-related activities the correctional officers' union and the state have understood to be compensable under the FLSA.[9] In *Stoetzl*, the MOUs governing the represented plaintiffs' employment provided, for most of the employees, a 28-day work schedule with 160 hours of " 'on post' duty" and four hours of " 'pre and post work activities.' " (*Stoetzl*, *supra*, 7 Cal.5th at pp. 731–733.) The phrase "pre and post work activities" referred to duty-integrated walk time (that is, activity compensable under the FLSA), not entry-exit walk time. (*Id*. at p. 731.) According to the state's chief negotiator, compensated duty-integrated walk time "only encompassed activities that began when an employee first picked up his or her equipment in the central control area of the prison facility and . . . ended when an employee dropped off the same equipment at the end of his or her shift" and "did *not* include time spent between entering the outermost gate of a prison facility and first picking up equipment, or time spent leaving a facility after dropping off equipment." (*Ibid*.) The union's

---

[8] As to the represented plaintiffs, the court concluded the MOUs governing their employment were "legislative enactments that because of their specificity, supersede[d] the more general state laws on which the represented plaintiffs base[d] their claims." (*Stoetzl*, *supra*, 7 Cal.5th at p. 740.) As to the unrepresented plaintiffs, the court noted, "the Legislature expressly authorized CalHR to provide for overtime payments as prescribed by the FLSA" (*id*. at p. 745, citing Gov. Code, § 19845, subd. (a)), and concluded CalHR's "Pay Scale Manual, including its narrow FLSA-based definition of compensable work time, governs the right of the unrepresented plaintiffs to compensation and . . . they are not entitled to minimum wage compensation based on Wage Order No. 4's broader definition of compensable work time." (*Id*. at p. 749.)

[9] *Stoetzl* is also instructive in other respects as we discuss below.

chief negotiator similarly understood the four hours of compensation for duty-integrated walk time was for " 'picking up your keys, picking up your tools, Mace, whatever was appropriate for the particular post that they were working.' " (*Id.* at p. 732.)

Notably, there were two job classifications, "Correctional Counselors I" and "Correctional Counselors II," for which the MOUs "did not allocate any time for 'pre and post work activities.' The trial court made a factual finding, with respect to those employees, that 'neither the State nor [the union] believed that these individuals engaged in any compensable [pre- and postwork activities].' " (*Stoetzl, supra*, 7 Cal.5th at p. 731, fn. 8.)

Our high court concluded the represented plaintiffs' claims all failed. As to their minimum wage claim, the court explained the MOUs provided for compensation for duty-integrated walk time and nothing suggested "that duty-integrated walk time ever went uncompensated." (*Stoetzl, supra*, 7 Cal.5th at p. 744.) The court continued, "Although the MOUs did not specifically refer to entry-exit walk time, they expressly stated that they constituted the entire understanding of the parties regarding the matters they addressed, and compensation for pre- and postwork activities was one of those matters. Moreover, the Legislature's enactment of special laws approving the MOUs . . . precludes the represented plaintiffs' reliance on more general state laws to support their minimum wage claims." (*Ibid.*) The court concluded the represented plaintiffs' claim for breach of contract failed because they had not shown the "terms of their employment [as provided in the MOUs] included walk time that these employees actually worked and that the state failed to compensate." (*Id.* at p. 750.)

17

C.    *Analysis*

    1.    <u>The Trial Court Should Have Accepted as True Plaintiffs'</u>
<u>Allegation that Providing Security Is Among the Principal</u>
<u>Activities They Are Employed to Perform</u>

In *Aguilar*, the court held that when prison employees' principal activities include " 'maintaining 'the custody and discipline of inmates,' 'supervising detainees,' 'searching for contraband[,] and *providing security*' " (*Aguilar*, *supra*, 948 F.3d at p. 1277, italics added), undergoing security screenings "is integral and indispensable to their principal activities" and is therefore compensable under the FLSA (*id.* at p. 1279).

Here, plaintiffs—presumably aware of *Aguilar*—expressly alleged that "a principal activity of class members is to *provide* safety and *security* for all prison occupants" and that they "are specially *employed to focus on and promote* the *security* and safety of staff, visitors, and inmates." (Capitalization and bolding deleted, italics added.)

In ruling that plaintiffs failed to state a claim, the trial court reasoned: "Like [*Integrity Staffing v.*] *Busk* and unlike *Aguilar*, despite Plaintiffs' attempt to claim that one of their principal activities is to 'provide safety and security for all prison occupants' (see, FAC, ¶¶ 22-35), *the productive work Plaintiffs are employed to perform is* dental care, *not the security of the prison*. The bag checks, security screenings, and collection and return of alarm devices and other equipment are not closely related activities integral and indispensable to the performance of dental care.  Consequently, these activities are not compensable under the FLSA and the Portal-to-Portal Act." (Italics added.)

Thus, the trial court accepted *Aguilar*'s holding but did not credit plaintiffs' allegations that a principal activity of their employment is to provide security and that they were specially employed to promote security.

However, " '[i]t is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading.' [Citation.] In considering the merits of a demurrer, 'the facts alleged in the pleading are deemed to be true, however improbable they may be.' " (*Requa v. Regents of University of California* (2012) 213 Cal.App.4th 213, 222–223.)

Plaintiffs contend the trial court improperly resolved questions of fact in sustaining defendants' demurrer. We agree. "Questions of fact cannot be decided on demurrer." (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 172 (conc. & dis. opn. of Kennard, J.).) In this case, plaintiffs alleged that "provid[ing] safety and security for all prison occupants" is a principal activity they are employed to perform. But, in ruling on the demurrer, the trial court effectively determined as a factual matter that this allegation is not true, as it found plaintiffs' productive work does *not* include "the security of the prison," "despite" plaintiffs' allegations to the contrary. This was error. The trial court should have accepted plaintiffs' factual allegations as true even if those allegations seemed improbable or unlikely to be proven.

Defendants respond that "merely following safety and security directives does not convert activities taken in response to those directives into an integral and indispensable part of the job duties of a dental hygienist or dental assistant." Defendants' argument is not satisfactory because it *assumes* that plaintiffs' duties as dental hygienists and assistants within the prison system do *not* include providing security even though plaintiffs specifically allege that "provid[ing] safety and security for all prison occupants" is a principal activity of their job. Given plaintiffs' allegations,

19

whether their principal activities include providing safety and security is a question of fact that cannot be resolved on demurrer.

2. The Comprehensive MOU Precludes Plaintiffs from Seeking Additional Wages Under General State Wage Laws

As an alternative ground to affirm the judgment, defendants contend (as they did below) that *Stoetzl* dictates that the MOU in this case precludes plaintiffs from pursuing *any* of their four causes of action. We do not read *Stoetzl* as preventing plaintiffs from pursuing a claim to recover wages plaintiffs allege they are owed under the MOU, but we agree with defendants that *Stoetzl* means plaintiffs cannot bring wage claims based on state wage laws because the MOU supersedes these more general state laws. This means defendants' demurrer was properly sustained as to plaintiffs' first and second causes of action.

In *Stoetzl*, the California Supreme Court explained, "Since enactment of the Ralph C. Dills Act in 1977 (the Dills Act) (Gov. Code, § 3512 et seq.), state government employees have had the right to be represented by a union and to bargain collectively over the wages, hours, and terms of employment. [Citations.] The Director of CalHR represents the Governor in these negotiations [citations], and once a union and the director have reached agreement, they are required to prepare an MOU memorializing the terms of that agreement [citation]. Significantly, 'the Dills Act is a " 'supersession statute' " [citation], meaning that when a provision of an MOU conflicts with an otherwise applicable statutory provision governing the terms and conditions of employment, the provision of the MOU generally "supersedes" or prevails over the terms of the otherwise applicable statute, without any need for further legislative approval of the conflicting MOU provision. [Citation.]' " (*Stoetzl, supra*, 7 Cal.5th at p. 738.)

20

Addressing the plaintiffs' minimum wage claim, the *Stoetzl* court concluded that "the represented plaintiffs agreed, through the collective bargaining process, to receive a specific amount of compensation for walk time, and the state's minimum wage laws do not entitle them to additional compensation." (*Stoetzl, supra,* 7 Cal.5th at p. 737.) The court reasoned, "The represented plaintiffs . . . agreed through the collective bargaining process to forgo compensation for entry-exit walk time. Each of the MOUs included a heading that read 'Entire Agreement,' followed by a provision that stated: 'This [MOU] sets forth the full and entire understanding of the parties regarding the matters contained herein . . . .' Compensation was certainly one of the 'matters contained' (i.e., provided for) in each of the MOUs. In fact, the preamble of each of the MOUs stated: 'This AGREEMENT . . . has as its purpose . . . the establishment of *rates of pay*, hours of work, and other terms and conditions of employment.' (Italics added.) Therefore, pursuant to the integration clauses, the MOUs 'set[ ] forth the full and entire understanding of the parties regarding' compensation, precluding any forms of compensation not addressed in the MOUs. More to the point, each of the MOUs made specific provision for compensating pre- and postwork activities, providing four hours' pay for such activities in a recurring 28-day work period. Because the MOUs 'set[ ] forth the full and entire understanding of the parties regarding the matters contained [t]herein,' and because compensation for [pre- and] postwork activities was one of the 'matters contained' in each of the MOUs, the MOUs precluded compensation for entry-exit walk time by not making any provision for it." (*Id*. at p. 740.)

The court continued, "*Moreover*, the MOUs were all approved by the Legislature, with this approval signed by the Governor and chaptered into law. Thus, the MOUs became legislative enactments that because of their

specificity, supersede the more general state laws on which the represented plaintiffs base their claims." (*Stoetzl*, *supra*, 7 Cal.5th at p. 740, italics added.)

In the current case, the preamble to the governing MOU similarly provides, "This MEMORANDUM OF UNDERSTANDING . . . has as its purpose . . . the establishment of rates of pay, hours of work, and other conditions of employment, including health and safety," and the MOU includes a section titled "Entire Agreement," which provides that the parties "each had unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understanding and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Contract."

The MOU in this case differs from the one in *Stoetzl* in that it does not provide for four hours of pay each work period for pre- and postwork activities. But it is nonetheless a comprehensive agreement between the union and the state addressing in great detail "rates of pay, hours of work, and other conditions of employment."[10] Following the California Supreme Court's reasoning in *Stoetzl*, we conclude the MOU in this case is a legislative

---

[10] The MOU, not including side letters and appendices, spans 370 pages; Article 11 on "Salaries" alone covers over 48 pages; Article 19 on "Hours of Work and Overtime" covers more than 35 pages. (Capitalization omitted.)

We also note that, even in *Stoetzl*, there was a subset of represented plaintiffs (correctional counselors) for whom the MOUs did not provide compensation for pre- and postwork activities, but our high court did not apply different reasoning as to these represented plaintiffs. (*Stoetzl*, *supra*, 7 Cal.5th at p. 731, fn. 8.)

enactment that, because of its specificity, supersedes the more general state wage laws on which plaintiffs base their first and second causes of action.[11]

Responding to defendants' argument that the MOU forecloses their claims, plaintiffs agree with defendants that "the MOU incorporates the FLSA and the Portal-to-Portal Act to determine which activities should be afforded compensation," and they do not mention general state wage laws at all. Thus, plaintiffs fail to explain why they should be able to bring claims under general state minimum wage laws when *Stoetzl* instructs that the MOU supersedes these more general laws.

Under *Stoetzl*, plaintiffs may bring wage claims only to the extent they claim they were not paid for time they spent on work-related activities that are compensable *under the MOU*, and by extension, the FLSA. (See *Stoetzl*, *supra*, 7 Cal.5th at p. 750 [the represented plaintiffs could succeed in a breach of contract claim only "insofar as the legislatively created terms of their employment [found in the applicable MOUs] included walk time that these employees actually worked and that the state failed to compensate"].) Plaintiffs do not argue otherwise. Consequently, plaintiffs may not

_____

[11] The statutes plaintiffs rely on generally set the minimum wage and provide a right of action for failure to pay the applicable minimum wage or legal overtime compensation. (See §§ 1182.11 [setting a minimum wage of not less than $5.75 per hour by March 1, 1998, and providing that the Industrial Welfare Commission to adopt wage orders]; 1182.12 [scheduled increases in the minimum wage]; 1194, subd. (a) ["Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit"].) There is no question that the 370-page MOU is more specific legislation than these general statutes concerning the terms and conditions of plaintiffs' employment including compensation.

23

separately claim they are also entitled to additional compensation under the general state wage laws of Labor Code sections 1182.11, 1182.12, and 1194 (their first and second causes of action).

However, we reject defendants' argument that *all* of plaintiffs' claims are foreclosed by *Stoetzl* and the applicable MOU. "[A]lthough the terms of public employment are legislatively determined, when a public agency employee has *completed* his or her work in accordance with those legislative terms, the employee's right to receive compensation for the completed work ripens into a contractual right that is protected by the contract clause of the state Constitution." (*Stoetzl, supra,* 7 Cal.5th at p. 750.)[12] Plaintiffs, therefore, are permitted to bring a contract claim to the extent their claim is based on allegations the state failed to compensate them for completed activities that are compensable under the terms of the MOU (their third cause of action).

### 3. Labor Code Section 222 Does Not Apply to Defendants

In their fourth cause of action, plaintiffs assert defendant failed to pay wages in violation of section 222. We agree with defendants that this claim fails because section 222 does not apply to them.

Section 222 provides, "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either wilfully or

---

[12] In *Stoetzl*, the trial court rejected the represented plaintiffs' breach of contract claim after trial because plaintiffs failed to prove they were owed additional compensation under the MOUs as they could not, "*as a factual matter*, show that duty-integrated walk time ever went uncompensated." (*Stoetzl, supra*, 7 Cal.5th at p. 739, italics added.) Here, of course, plaintiffs have not yet attempted to prove they were not paid for activities that are compensable under the MOU.

unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon."

"A traditional rule of statutory construction is that, absent express words to the contrary, governmental agencies are not included within the general words of a statute." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1192; see *Stone v. Alameda Health System* (2024) 16 Cal.5th 1040 [quoting *Wells* and observing the rule "is deeply embedded in our state's jurisprudence"].)  The Legislature recognizes this rule applies to the Labor Code.  (*California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 653; see *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 330 [quoting Senate Committee legislative analysis explaining that generally " 'provisions of the Labor Code apply only to employees in the private sector unless they are specifically made applicable to public employees' "].)  And courts regularly apply this rule to the Labor Code.  (E.g., *Allen v. San Diego Convention Center Corp., Inc.* (2022) 86 Cal.App.5th 589, 597 ["governmental actors enjoy protection from liability under the Labor Code unless a statute specifically brings a public employer within its ambit"]; *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2021) 60 Cal.App.5th 327, 338–339 [applying rule and concluding section 221 did not apply to charter counties]; *California Correctional Peace Officers' Assn.*, *supra*, 188 Cal.App.4th at pp. 651–653 [applying rule and concluding meal break statutes did not apply to public employer]; *Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 736 [same].)

Here, section 222 does not expressly provide that it applies to governmental agencies or public employees.  Under the traditional rule of statutory construction stated in *Wells*, section 222 does not apply to

defendants. Plaintiffs offer no reason to depart from this rule in interpreting section 222, and we see no reason to. While we have found no authority specifically holding that a public employee cannot bring a claim under section 222, in *Stoetzl*, our high court expressed doubt that section 222 permits a private right of action at all, or that such a private lawsuit could be brought against a state employer. (*Stoetzl, supra*, 7 Cal.5th at p. 752 ["It is not at all clear that there is a private right of action for violation of Labor Code sections 222 and 223 (see Lab. Code, § 225.5 [specifying civil penalties that the Labor Commissioner may recover]), nor is it clear that these Labor Code provisions apply against the state government"].) Accordingly, the trial court properly sustained the demurrer as to plaintiffs' fourth cause of action.

4. <u>Defendants' Affirmative Defense of Failure to Exhaust Contractual Remedies Cannot Be Decided on Demurrer</u>

Defendants contend another reason to affirm the judgment is that plaintiffs failed to exhaust their contractual remedies.[13] We reject this basis for affirming the judgment because the question whether the MOU requires plaintiffs to exhaust contractual remedies cannot be resolved on the record before us.

Article 6 of the governing MOU is titled "GRIEVANCE, ARBITRATION, AND AWOL PROCEDURES." Section 6.1, paragraph A, provides, "This grievance procedure shall be used to process and resolve grievances arising under this Contract and employment-related complaints." At section 6.2, paragraph A, a grievance is defined as "a dispute of one or more employees, or a dispute between the State and the Union, involving the

_____

[13] Defendants raised this argument with the trial court in their demurrer.

interpretation, application, or enforcement of the express terms of this Contract."

In *Charles J. Rounds Co. v. Joint Council of Teamsters No. 42* (1971) 4 Cal.3d 888, 894 (*Charles J. Rounds*), the California Supreme Court recognized, "[I]n the absence of waiver by the other party, an aggrieved party must seek to enforce his contractual right to arbitration before suing for breach of contract. ' "[S]uch arbitration, or an unsuccessful attempt to secure the same, is a condition precedent" to the right to maintain an action for breach of the contract.' " The court held that when a plaintiff sues a defendant over a dispute covered by an arbitration agreement, the defendant may elect to assert failure to arbitrate as an affirmative defense. (*Id.* at p. 899.)

Relying on *Charles J. Rounds*, defendants assert their demurrer should be sustained based on plaintiffs' failure to exhaust Article 6's grievance procedure.

Plaintiffs respond that the MOU in this case does not require exhaustion of the grievance procedure because it does not specify that the grievance procedure is "the *exclusive* means of resolving disputes or that employees are prohibited from asserting claims in court." (Italics added.) They argue a collective bargaining agreement must "clearly and unmistakably" require that a grievance procedure is the exclusive means of resolving a dispute for a defendant to successfully raise an exhaustion defense.[14]

---

[14] Plaintiffs cite *Desert Regional Medical Center, Inc. v. MacManes* (C.D. Cal., June 11, 2021) 2021 WL 4459676, at *3, in which the district court held a collective bargaining agreement (CBA) "must 'clearly and unmistakably' require employees to use [its] Union grievance procedures 'rather than skipping over that process and proceeding directly to court.' "

27

Plaintiffs also cite a provision in Article 5, "GENERAL PROVISIONS" as evidence that the parties never intended exhaustion of the grievance procedure to be a condition precedent to filing a lawsuit. Section 5.7, paragraph D, provides, "The filing of a grievance is not mandatory and neither the filing nor non-filing of a grievance shall be construed as a waiver of an employee's right to maintain a separate, private cause of action."

Disagreeing with plaintiffs' interpretation of the MOU, defendants reply that section 5.7, paragraph D, is "an exception to the general exhaustion requirement contained in Article 6 of the MOU" and that the exception applies only to discrimination and harassment claims. Section 5.7 is titled "Non-Discrimination," and section 5.7, paragraph A, prohibits discrimination and harassment "in State employment." Plaintiffs point out, on the other hand, that section 5.7, paragraph D, is not limited to disputes "under this section."[15] We also note that section 5.7, paragraph E, provides, "Alleged retaliation *may* be subject to the grievance and arbitration procedure" (italics added), which indicates, at the very least, that the parties did not intend the grievance procedure to be the exclusive means of resolving *all* disputes that might arise under the MOU.

In *Charles J. Rounds*, our high court observed that the affirmative defense of failure to exhaust contractual arbitration remedies may be raised

There, the court observed, "the presence of an arbitration agreement in a CBA does not automatically displace other remedies." (*Id.* at *2.)

[15] Plaintiffs note that, in contrast, the next provision expressly specifies that it applies to "this section." Section 5.7, paragraph E, states, "No employee shall be subject to retaliation . . ., nor shall any employee be restrained, coerced or otherwise interfered with in the exercise of the employee's rights *under this section*." (Italics added.) This demonstrates that the parties knew how to limit provisions to particular sections when that was their intention.

by demurrer or motion for summary judgment.  (4 Cal.3d at p. 899.)  In that case, there was a trial on the defendant union's "special defense" of failure to arbitrate after which "[t]he trial court ruled that the employer's suit was barred because it had failed to adhere to the requirements of the arbitration provisions of the [parties' collective bargaining] agreement."  (4 Cal.3d at p. 891.)  Our high court affirmed the judgment after "conclud[ing] that it was the intention of the parties to include the instant [dispute] within the coverage of the arbitration clause."  (*Id*. at p. 894.)  Here, in contrast, we are at the pleading stage, and we cannot say the language of the MOU establishes as a matter of law that the parties intended the grievance and arbitration procedure to be the exclusive remedy for disputes such as plaintiffs' wage claim.  (Cf. *Service Employees International Union, Local 1000 v. Department of Personnel Admin*. (2006) 142 Cal.App.4th 866, 870 [after a successful demurrer, the reviewing court "cannot consider conflicting extrinsic evidence in aid of interpretation of the arbitration agreement"].)  In this circumstance, we conclude the merits of defendants' affirmative defense cannot be decided on demurrer.

    5.    <u>Plaintiffs' Contract Claim Is Not Time Barred</u>

Finally, defendants argue the judgment may be affirmed because plaintiffs' claims are barred by the one-year statute of limitations of Government Code section 19815.8.

Government Code section 19815.8, subdivision (a), provides in pertinent part, "No action or proceeding shall be brought by any person having or claiming to have a cause of action or complaint or ground for issuance of any complaint or legal remedy for wrongs or grievances based on or related to any law administered by the Department of Human Resources unless the action or proceeding is commenced and served within one year

29

after the cause of action or complaint or ground for issuance of any writ or legal remedy first arose."

Plaintiffs alleged they began working for the CDCR in 2008 (Roberts), 2011 (Bath), and 2016 (Bomar). Defendants assert plaintiffs' claims "first arose" when they began working and, therefore, the claims are now time barred. We are not persuaded.

Our high court has explained that, when a governmental entity unlawfully withholds payment from an employee, "each deficient payment constitutes a separate violation triggering the running of a new period of limitations, and hence . . . the employee can recover only those payments which accrued within the period of the applicable statute of limitations preceding the filing of his complaint." (*Green v. Obledo* (1981) 29 Cal.3d 126, 141.) Following the logic of *Green*, we conclude plaintiffs in this case may pursue a claim for compensation based on allegations that they performed compensable work that went uncompensated during the period of the applicable statute of limitations preceding the filing of their complaint.[16]

## DISPOSITION

The trial court's order filed April 21, 2023, on the demurrer is reversed as to plaintiffs' third cause of action for "failure to pay regular wages and/or overtime in breach of common law contractual obligations" and is affirmed as to the first, second, and fourth causes of action. The judgment is reversed,

---

[16] The parties disagree on what statute of limitations apply. Plaintiffs argue the four-year statute of limitations for contract claims (Code Civ. Proc. § 337, subd. (a))—not the one-year limitations period of Government Code section 19815.8—applies in this case. We need not decide this question because plaintiffs' claims are not time barred regardless of which statute of limitations applies.

and the matter is remanded for further proceedings consistent with this opinion.

The parties are to bear their own costs on appeal,

_____

Miller, J.

WE CONCUR:

_____

Richman, Acting P. J.

_____

Desautels, J.

A167908, *Bath et al. v. State of California et al.*

Filed 10/23/24 after nonpublished opinion filed 9/25/24
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| AZEEM BATH et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> STATE OF CALIFORNIA et al., <br><br>     Defendants and Respondents. | A167908 <br><br> (Solano County Super. Ct. <br>  No. FCS058670) <br> ORDER GRANTING <br> PUBLICAITON |

**BY THE COURT:**

The opinion in the above-entitled matter filed on September 25, 2024, was not certified for publication in the Official Reports.  For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.


Dated:_____                    _____

                                                       Richman, Acting P.J.

1

Court: Solano County Superior Court

Trial Judge: Hon. Alesia F. Jones

Kaufman Dolowich Voluck, Arthur S. Gaus; McLaughlin & Stern, Lee S. Shalov, Jason S. Giaimo, for Plaintiffs and Appellants

Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra, Terilynn Diepenbrock; California Department of Human Resources, Frolan Aguiling, Christopher E. Thomas, David M. Villalba, for Defendants and Respondents

A167908, *Bath et al. v. State of California et al.*